In re the Termination of Parental Rights to
Chezron M., a Person Under the Age of 18:

State of Wisconsin,
Petitioner-Respondent,

v.

James P.,
Respondent-Appellant-Petitioner.

Supreme Court

No. 2004AP723. *Oral argument March 2, 2005.*
*—Decided June 17, 2005.*

2005 WI 80

(Also reported in 698 N.W.2d 95.)

For the respondent-appellant-petitioner there were briefs by *Carl W. Chesshir,* Milwaukee, and oral argument by *Carl W. Chesshir.*

For the petitioner-respondent the cause was argued by *Thomas C. Binger,* assistant district attorney, with whom on the brief was *E. Michael McCann,* district attorney.

A guardian ad litem brief was filed by *Shelia R. Hill-Roberts* and *Legal Aid Society of Milwaukee, Inc.,* Milwaukee, and there was oral argument by *Shelia R. Hill-Roberts.*

An amicus curiae brief was filed by *Scott A. Sussman,* Madison, on behalf of the Center for Family Policy and Practice.

¶ 1. JON P. WILCOX, J. This is a review of a published court of appeals decision, *State v. James P.,* 2004 WI App 124, 274 Wis. 2d 494, 684 N.W.2d 164, affirming an order of the Milwaukee County Circuit Court, Joseph R. Wall, Judge, that terminated James P.'s parental rights to Chezron M.

¶ 2. James P. argues that grounds did not exist to terminate his parental rights to Chezron M. under Wis. Stat. § 48.415(1)(a)3. (2001–02)[1] because he had not been adjudicated the biological father of Chezron M. prior to the alleged periods of abandonment and thus

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

was not her "parent," as defined in Wis. Stat. § 48.02(13), when the abandonment occurred. We disagree and affirm.

## I. FACTUAL BACKGROUND

¶ 3. The following facts were found by the circuit court and are undisputed on appeal. Chezron M. (Chezron) was born to Judy M. on April 25, 1995. Judy M. was unmarried but was having relations with James P. at the time she conceived. Judy M. told James P. that the child could be his or that of another man.[2] James P. was present at the hospital when Chezron was born. His insurance paid the costs of Chezron's birth, as he had her listed on his medical insurance policy as his daughter.

¶ 4. "James P. cared for Chezron and treated her as his biological daughter." He added her to his life insurance policy as his daughter. Chezron called James P. " 'dad,' and he considered Chezron 'family.' "

¶ 5. In March of 1998, Chezron was found to be in need of protection and services due to Judy M.'s parental failings. In all court records, James P. was listed as the alleged father of Chezron. James P. attended no less than three Children in Need of Protective Service (CHIPS) hearings between 1998 and 2001 that were held for Chezron.

¶ 6. The last time James P. saw Chezron was during an informal visit in 1999. On two occasions between 2000 and 2001, James P. sent presents to Chezron via a case manager from the Milwaukee Child

---

[2] There was evidence presented at trial that Judy M. never suggested to third parties that anyone other than James P. was the father of Chezron.

Welfare Bureau. During this period, James P. did not visit Chezron or otherwise contact her. James P. did not attempt to remove Chezron from foster care or hire an attorney to do so. He did not attempt to contact Chezron, the social workers, or her foster parents, and he failed to respond to inquiries made by Chezron's case manager. James P. made no attempt to be legally acknowledged as Chezron's father.[3]

## II. PROCEDURAL POSTURE

¶ 7. On May 16, 2002, the State filed a petition to terminate the parental rights of James P. to Chezron. The petition listed James P. as the "alleged father" of Chezron. As grounds for the termination, the petition listed failure to assume parental responsibility under Wis. Stat. § 48.415(6). Sometime thereafter in early 2002, James P. was adjudicated the father of Chezron as a result of DNA testing.[4] The State subsequently amended the petition on June 13, 2002, to list James P. as the "adjudicated father" of Chezron. On October 7, 2002, the State filed another amended petition, adding abandonment under § 48.415(1)(a)3. as a ground for termination of James P's parental rights. The State subsequently moved to dismiss the failure to assume parental responsibility ground against James P., and the court granted the motion.

---

[3] Despite his involvement in these legal proceedings concerning Chezron, James P. did nothing to officially acknowledge his fatherhood because in his view, "the children belonged with the mother."

[4] James P. stated at trial that the only reason he became adjudicated the father of Chezron was so that her mother, who voluntarily consented to have her parental rights terminated, could still see Chezron.

¶ 8. The case was tried to the circuit court, and James P. admitted that he had no contact with Chezron between April 25, 2000, and December 25, 2000, and between April 25, 2001, and December 25, 2001. One of James P.'s defenses was that he did not know Chezron was his child until he was adjudicated her father. The circuit court specifically found that James P. was not credible and his assertion that he did not know he was Chezron's father was not believable.

¶ 9. At the close of the evidence, James P. moved to dismiss the petition on the basis that the ground of abandonment in § 48.415(1)(a)3. does not apply to someone who is merely an "alleged father," that is, someone who *may* be the parent of a nonmarital child during the periods of alleged abandonment but has not officially been adjudicated as the child's father. The circuit court denied the motion, reasoning: "[A] man adjudicated as the biological father *has always been* the biological father and, therefore, that man has always been a 'parent' under § 48.02(13)." The court concluded that "James P. was always the father of Chezron." The court also found that James P. had failed to establish the affirmative defense of "good cause for failing to communicate with [Chezron]."[5]

¶ 10. As such, the court found the State met its burden of proving the ground of abandonment under § 48.415(1)(a)3. The court therefore found James P.

_____

[5] The statutory ground for abandonment contains a "good cause" affirmative defense that may be established upon proof that the parent had good cause for failing to visit the child, or had good cause for failing to communicate with the child and, if the child is an infant, that the parent communicated about the child with the person having custody of the child or had good cause for failing to communicate about the child with the person having custody of the child. Wis. Stat. § 48.415(1)(c).

unfit pursuant to Wis. Stat. § 48.424(4). At the dispositional hearing, the court found that it was in the best interest of Chezron that James P.'s parental rights be terminated pursuant to Wis. Stat. § 48.427(3). On December 9, 2003, the circuit court entered an order terminating James P.'s parental rights, which order James P. subsequently appealed.

¶ 11. At the court of appeals, James P. again argued that § 48.415(1)(a)3. does not apply to him because he was not a "parent," as defined under § 48.02(13), until he was adjudicated Chezron's biological father. The court of appeals noted that among the definitions of "parent" found in § 48.02(13), two were applicable: "a biological parent" and "a person . . . adjudicated to be the biological father." *James P.,* 274 Wis. 2d 494, ¶¶ 4–5. The court of appeals rejected James P.'s argument, reasoning that under the first definition, the fact of biological parenthood did not depend on official state recognition. *Id.,* ¶ 4. The court of appeals further reasoned that although the law can terminate the parental relationship, it does not "*create* biological parenthood." *Id.,* ¶ 6.

¶ 12. The court of appeals specifically cautioned that it was not addressing "whether an adjudication subsequent to acts that comprise grounds for the termination of a person's parental rights subjects the adjudicated person to the termination of parental rights based on those acts[.]" *Id.,* ¶ 5. Rather, the court of appeals held that the first definition of "parent" applied to James P. because he "was *always* Chezron's biological father, even before he was formally adjudicated as such." *Id.* The court of appeals stated that James P. "was in fact Chezron's biological parent when she was born and he has never denied that." *Id.,* ¶ 6.

¶ 13. The court of appeals was not persuaded by James P.'s argument that the first definition applied only to children born to parents who were married because the first definition was not "*in haec verba,* limited to children of a solemnized marriage." *Id.* The court of appeals stated that James P.'s arguments were merely "an attempt to eschew legal responsibility for the periods during which he had no contact with Chezron[.]" *Id.,* ¶ 6. Relying on this court's decision in *Wisconsin Citizens Concerned for Cranes and Doves v. DNR,* 2004 WI 40, ¶¶ 19–24, 270 Wis. 2d 318, 677 N.W.2d 612, the court of appeals stated that the fact that individuals falling under the first definition of "parent" may also be included under the last definition of "parent" does not narrow the scope or application of the first definition. *James P.,* 274 Wis. 2d 494, ¶ 6. Therefore, the court of appeals affirmed the circuit court order terminating James P.'s parental rights to Chezron.

## III. ISSUE

¶ 14. The narrow question we address on appeal is whether an individual who is in fact the biological parent of a nonmarital child may have his parental rights to that child terminated based on conduct that occurred before he was officially adjudicated the biological father based on DNA evidence. In other words, we must determine whether an individual who is in fact the biological parent of a nonmarital child meets the definition of "parent" under § 48.02(13) at a time when he has yet to be officially adjudicated as the biological father. We emphasize that we, like the court of appeals, do *not* address "whether an adjudication subsequent to acts that comprise grounds for the termination of a

person's parental rights subjects the adjudicated person to the termination of parental rights based on those acts[.]" *James P.,* 274 Wis. 2d 494, ¶ 5. That is, we do not decide whether an individual who is legally adjudicated to be the biological parent of a nonmarital child, but is not *in fact* the biological father, may have his parental rights terminated based on conduct that occurred prior to the adjudication.

¶ 15. We hold that an individual who is in fact the biological father of a nonmarital child satisfies the definition of "parent" in § 48.02(13), as he is a "biological parent," notwithstanding that he has not officially been adjudicated as the child's biological father. Because such an individual satisfies the definition of "parent," he may have his parental rights terminated based on periods of abandonment that occurred prior to his official adjudication as the child's biological father, assuming he has failed to establish a "good cause" affirmative defense to the ground of abandonment.

## IV. STANDARD OF REVIEW

¶ 16. This case concerns the meaning of "parent" under § 48.02(13). The interpretation of a statute and its application to a set of facts are issues of law reviewed de novo by this court. *Columbus Park Hous. Corp. v. City of Kenosha,* 2003 WI 143, ¶ 9, 267 Wis. 2d 59, 671 N.W.2d 633. The rules governing statutory interpretation are well settled:

> When interpreting statutes, our goal is to give effect to the language in the statute. *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 43, 271 Wis. 2d 633, 681 N.W.2d 110. We begin by looking to the

language of the statute because we "assume that the legislature's intent is expressed in the statutory language." *Id.,* ¶ 44. Technical terms or legal terms of art appearing in the statute are given their accepted technical or legal definitions while nontechnical words and phrases are given their common, everyday meaning. Wis. Stat. § 990.01(1). Terms that are specifically defined in a statute are accorded the definition the legislature provided. *Wisconsin Citizens Concerned for Cranes and Doves,* 270 Wis. 2d 318, ¶ 6. In addition, we read the language of a specific statutory section in the context of the entire statute. *Id.* Thus, we interpret a statute in light of its textually manifest scope, context, and purpose. *Kalal,* 271 Wis. 2d 633, ¶ 48 & n.8.

*Bosco v. LIRC,* 2004 WI 77, ¶ 23, 272 Wis. 2d 586, 681 N.W.2d 157. Therefore, extrinsic sources, such as legislative history, are not consulted unless the statute is ambiguous. *Kalal,* 271 Wis. 2d 633, ¶ 46. A statute is ambiguous if it is susceptible to more than one reasonable understanding. *Id.,* ¶ 47.

## V. ANALYSIS

¶ 17. Section 48.415(1)(a)3. provides that grounds exist to terminate an individual's parental rights if "[t]he child has been left by the *parent* with any person, the *parent* knows or could discover the whereabouts of the child and the *parent* has failed to visit or communicate with the child for a period of 6 months or longer." (Emphasis added.) James P. does not contest that he did not visit or otherwise communicate with Chezron during the alleged periods of abandonment. In addition, he does not contest the circuit court's ruling that he failed to establish "good cause" for failing to visit or communicate with Chezron during the periods in question. Rather, James P. asserts that he was not the "parent" of Chezron during the periods of alleged abandonment.

¶ 18. Section 48.02(13) defines "parent" as follows:

> "Parent" means either a biological parent, a husband who has consented to the artificial insemination of his wife under s. 891.40, or a parent by adoption. If the child is a nonmarital child who is not adopted or whose parents do not subsequently intermarry under s. 767.60, "parent" includes a person acknowledged under s. 767.62(1) or a substantially similar law of another state or adjudicated to be the biological father. "Parent" does not include any person whose parental rights have been terminated.

¶ 19. James P. does not dispute that he is the biological father of Chezron. Thus, presumably, he would qualify as a "parent" under the first sentence of the definition as a "biological parent."

¶ 20. However, according to James P., the phrase "biological parent" in the first sentence is inapplicable to him because it applies only to children who are born of solemnized marriages. Relying on the legislative history of § 48.02(13), James P. argues that the first sentence of § 48.02(13) applies exclusively to married individuals, whereas the second sentence is the exclusive mechanism by which an individual may qualify as a "parent" of a nonmarital child. As Chezron is a nonmarital child and James P. never legally acknowledged that he was the father, the only means by which he can satisfy the definition of "parent" under the second sentence is as "a person . . . adjudicated to be the biological father." Wis. Stat. § 48.02(13). James P. contends that because he was not adjudicated the biological father of Chezron until after the periods of alleged abandonment occurred, he was not her "parent" during this time frame and thus, he had no parental rights to terminate.

¶ 21. In contrast, the State argues that the definition of "parent" in § 48.02(13) is clear and unambiguous and that therefore it is unnecessary to resort to legislative history. The State agrees with the court of appeals that James P. clearly satisfies the definition of "parent" set forth in the first sentence of § 48.02(13), which, on its face, is not limited to married individuals. Further, the State argues that James P.'s interpretation of the statute would render it absurd and would discourage fathers of nonmarital children from coming forward and having courts recognize them as parents.

¶ 22. We agree with the State. We begin our analysis, as we must, by examining the text of § 48.02(13). *Kalal,* 271 Wis. 2d 633, ¶ 45. James P.'s argument is based on the premise that the first sentence in the definition of "parent" applies exclusively to children born of legal marriages, whereas an individual may qualify as a "parent" of a nonmarital child only under the second sentence in the definition. However, the text of the statute does not support this assertion.

¶ 23. The first sentence of § 48.02(13) provides: " 'Parent' *means* either a biological parent, a husband who has consented to the artificial insemination of his wife under s. 891.40, or a parent by adoption." (Emphasis added.) On its face, the first sentence is not limited to children born of legal marriages.

¶ 24. The second sentence of § 48.02(13) provides: "If the child is a nonmarital child who is not adopted or whose parents do not subsequently intermarry under s. 767.60, 'parent' *includes* a person acknowledged under s. 767.62(1) or a substantially similar law of another state or adjudicated to be the biological father." (Emphasis added.) Clearly, this sentence applies *only if* the child in question is a nonmarital child. However, while

this sentence is limited in its application to nonmarital children, it does not, on its face, state that it is the *exclusive* means by which an individual may qualify as the "parent" of a nonmarital child.

¶ 25. Furthermore, it is significant that the first sentence of the definition of "parent" utilizes the word "means," whereas the second sentence utilizes the word "includes." *Kalal,* 271 Wis. 2d 633, ¶ 46 ("[S]tatutory language is interpreted in the context in which it is used[.]"). When utilized in statutory definitions, "means" is a term indicating limitation or completeness, whereas "includes" is a term indicating partiality and expansiveness. *See* Stephen R. Miller, Legislative Reference Bureau, *Wisconsin Bill Drafting Manual* 2.01(1)(i)(2005–06).

■

¶ 26. Thus, "[g]enerally, the word 'includes' is to be given an expansive meaning, indicating that which follows is but a part of the whole." *Wisconsin Citizens Concerned for Cranes and Doves,* 270 Wis. 2d 318, ¶ 17 n.11 (citing *Milwaukee Gas & Light Co. v. Dept. of Taxation,* 23 Wis. 2d 195, 203 & n.2, 127 N.W.2d 64 (1964)). While courts may sometimes read the word "includes" as a term of limitation or enumeration under the doctrine of *expressio unius est exclusio alterius,* there must be some textual evidence that the legislature intended this doctrine to apply. *Id.*

¶ 27. Here, the text of § 48.02(13) contains no indication that the legislature intended the word "includes" in the second sentence to be read as a term of limitation. Indeed, the text indicates the opposite. First and foremost, the word "includes" appears in the sentence immediately following the general definition of "parent," in which the word "means" is utilized. If the

legislature had intended the second sentence of § 48.02(13) to be one of limitation or exclusivity, it would have used the word "means," as it did in the first sentence.

¶ 28. Moreover, the fact that the first sentence of § 48.02(13) provides a general definition of "parent" that is followed by a sentence listing additional circumstances under which an individual qualifies as a "parent" indicates that the second sentence should not be read as one of limitation or exclusivity. *Cf. Wisconsin Citizens Concerned for Cranes and Doves,* 270 Wis. 2d 318, ¶ 17 n.11 ("[M]any of the terms contained in Wis. Stat. § 29.001 are not defined by a general definition, but rather are defined by the use of the word 'includes' followed by a list of certain species.").

¶ 29. Furthermore, James P.'s interpretation simply cannot be squared with the remaining language in § 48.02(13). For instance, if James P. is correct that the second sentence lists the exclusive means by which an individual qualifies as a "parent" of a nonmarital child, then an individual who is not married and who adopts a child would not meet the definition of "parent." The first sentence of § 48.02(13), which, according to James P., applies only to married individuals, states that " '[p]arent' means . . . a parent by adoption." In contrast, the second sentence of § 48.02(13) states: *"If the child is a nonmarital child who is not adopted* or whose parents do not subsequently intermarry under s. 767.60, *'parent' includes* a person acknowledged under s. 767.62(1) or a substantially similar law of another state or adjudicated to be the biological father." (Emphasis added.) Notably, the second sentence, although referring to adopted children, does not list "a parent by adoption" after the word "includes." If "includes" is to be given a restrictive meaning, as James P. suggests, then

699

the second sentence specifically precludes an individual from becoming the "parent" of a nonmarital child through adoption.

¶ 30. While James P. asserts that an individual may be the "parent" of a nonmarital child through adoption, the statutory language and his interpretation of the word "includes" cannot support such a conclusion. The plain language in the statute limits the applicability of those items following the word "includes" to circumstances where "the child is a nonmarital child who is not adopted." The same illogical result occurs under James P.'s interpretation for unmarried individuals who produce children and subsequently intermarry.

¶ 31. In contrast, reading the word "includes" in the second sentence as a term of expansion produces results consistent with all the statutory language and common sense. Under this reading, the first sentence of § 48.02(13) provides a general definition of "parent" that applies to married and unmarried individuals. The second sentence merely provides additional circumstances under which an individual qualifies as a "parent" of "a nonmarital child who is not adopted or whose parents do not subsequently intermarry." Wis. Stat. § 48.02(13).

¶ 32. This interpretation of § 48.02(13) recognizes that an individual who adopts a nonmarital child qualifies as a "parent by adoption" under the general definition of "parent" in the first sentence. Likewise, two unmarried individuals who produce a child and subsequently intermarry appropriately qualify as parents under the first definition as "biological parents." Furthermore, an unmarried individual, like James P., who fathers a nonmarital child, qualifies as a "parent" under the first sentence as a "biological parent."

¶ 33. However, James P. argues that if we adopt this interpretation, part of the second sentence will be rendered superfluous. Specifically, he suggests that under our interpretation, the final statutory definition of "parent"—"a person . . . adjudicated to be the biological father[]"—will always be subsumed in the first definition—"a biological parent." We disagree that the final definition of "parent" will always be subsumed within the first definition because the final definition covers an individual "adjudicated to be the biological father," and is thus broader than the first definition, which applies only to "a biological parent."

¶ 34. As discussed extensively during oral argument, an adjudication of biological fatherhood is a legal determination, and an individual may be "adjudicated to be the biological father" of a child by default. In contrast, as the court of appeals correctly recognized through its colorful, metaphysical discussion, the phrase "a biological parent" in the first sentence of § 48.02(13) refers to the actual biological parent of a child:

> [T]he fact of biological parenthood does not turn on whether it is recognized, found, or adjudicated, any more than the fact that a tree has fallen in the forest depends on someone's perception of the crashing sound, or, in another context, gravity's existence depended on Sir Isaac Newton's formulation of its principles.
>
> . . . .
>
> . . . Although the law can terminate a parent-child relationship . . . only a power much much higher than law, lawyers, judges, states or nations can, as the State points out, *create* biological parenthood.

*James P.*, 274 Wis. 2d 494, ¶¶ 4, 6.

701

¶ 35. In other words, the phrase "adjudicated to be the biological father" in the second sentence of § 48.02(13) refers to someone who is legally determined to be a biological father, who may or may not be an actual biological parent—a *de jure* biological father. In contrast, the phrase "biological parent" in the first sentence refers to a person who actually is a biological parent—a *de facto* biological parent. While an individual who is "a biological parent" will always be capable of being "adjudicated to be the biological father[,]" an individual who is "adjudicated to be the biological father" is not necessarily "a biological parent."

¶ 36. As such, the second sentence of § 48.02(13) is not superfluous because although an individual may qualify as a "parent" under both the definition in the first sentence and the definition in the second sentence, the definition in the second sentence is broader than the first, as it applies to a factual scenario to which the first sentence does not—a biological father by default. As the court of appeals correctly recognized, the fact that a given item may fall within a narrow definition and also qualify under a broader definition does not narrow the scope of the broader definition. *Id.,* ¶ 6 (citing *Wisconsin Citizens Concerned for Cranes and Doves,* 270 Wis. 2d 318, ¶¶ 19–24).

¶ 37. Therefore, we conclude that the only reasonable reading of the text of § 48.02(13) is that the first sentence provides a general definition of "parent" that is applicable to both married and unmarried individuals. The second sentence supplies *additional* means by which an individual may qualify as the "parent" of "a nonmarital child who is not adopted or whose parents do not subsequently intermarry." The fact that the second sentence supplies additional means by which an individual may qualify as the "parent" of a nonmarital

child in certain circumstances in no way means that an individual may not also qualify as the "parent" of a nonmarital child under the general definition provided in the first sentence. Thus, the plain language of § 48.02(13) does not support James P.'s contention that the first sentence of the statute applies exclusively to married individuals and that individuals may qualify as parents of nonmarital children only under the circumstances set forth in the second sentence.

¶ 38. As we conclude there is but one reasonable reading of the plain text of the statute, there is no need to consult the legislative history of § 48.02(13). *Kalal*, 271 Wis. 2d 633, ¶ 46. However, we do note that our interpretation is consistent with the legislative purposes of the Children's Code, as explicitly set forth in the text of the Code. *See id.*, ¶ 49 (noting that the plain meaning of a statute should comport with any textually manifest statutory purpose).

¶ 39. Wisconsin Stat. § 48.01(1) provides, in pertinent part:

> In construing this chapter, the best interests of the child or unborn child shall always be of paramount consideration. This chapter shall be liberally construed to effectuate the following express legislative purposes:
>
> (a) While recognizing that the paramount goal of this chapter is to protect children and unborn children, to preserve the unity of the family, whenever appropriate, by strengthening family life through assisting parents and the expectant mothers of unborn children, whenever appropriate, in fulfilling their responsibilities as parents or expectant mothers. . . . The courts and agencies responsible for child welfare should also recognize that instability and impermanence in family relationships are contrary to the welfare of children and should therefore recognize the importance of elimi-

703

nating the need for children to wait unreasonable periods of time for their parents to correct the conditions that prevent their safe return to the family.

. . . .

(gr) To allow for the termination of parental rights at the earliest possible time after rehabilitation and reunification efforts are discontinued in accordance with this chapter and termination of parental rights is in the best interest of the child.

¶ 40. Under James P.'s interpretation of § 48.02(13), an individual who fathers a nonmarital child is not legally the "parent" of that child (and thus cannot have his parental rights terminated) unless and until he either acknowledges that he is the father of the child or is adjudicated to be the father of the child. This interpretation, in contrast to the express legislative purpose behind the Children's Code, encourages individuals like James P. to wait until the last possible moment to acknowledge their fatherhood or have a court adjudicate their parenthood, in order to avoid having their rights terminated. Thus, James P.'s interpretation provides an incentive for putative fathers to avoid taking legal responsibility for their children and does nothing to preserve family unity and stability.

¶ 41. In addition, James P.'s interpretation of § 48.02(13) allows an individual who has fathered a nonmarital child to establish a relationship with that child, disappear for unreasonable periods of time, and then seek to have his parental rights validated when it is most convenient for him. This type of ephemeral parenting is precisely the type of "instability and impermanence in family relationships" that the Code seeks to avoid. Wis. Stat. § 48.01(1)(a).

¶ 42. In contrast, our interpretation—which recognizes that an individual who is, in fact, the biological father of a child has always been the child's biological parent—encourages putative fathers to acknowledge their fatherhood or have a court determine their parenthood as soon as possible, encourages such individuals to fulfill their responsibilities as parents, and holds such individuals accountable when they fail to do so. If someone who is the actual biological father of a nonmarital child establishes a substantial relationship with that child and thereafter refuses to fulfill his legal duties and responsibilities by abandoning the child, our interpretation protects the child by allowing the State to terminate the father's rights "at the earliest possible time." Wis. Stat. § 48.01(1)(gr).

¶ 43. James P.'s interpretation, on the other hand, would not only lead to results contrary to the stated purposes of the Children's Code, his interpretation would lead to results that are patently absurd and that endanger child safety. Under James P.'s interpretation, an individual who is, in fact, the biological father of a nonmarital child cannot have his parental rights terminated unless and until he is legally adjudicated the child's biological father or acknowledges his fatherhood. An individual who never formally acknowledges his fatherhood and does not seek a legal determination of his parenthood until long after his child has been removed from his home is therefore free to engage in a variety of reprehensible conduct while living with the child and avoid being subject to a termination of his rights based on such conduct.

¶ 44. For instance, someone like James P. could murder the mother of his child and yet avoid having his parental rights terminated under Wis. Stat. § 48.415(8) because he was not the "parent" of the child (as he had

yet to be adjudicated the biological father) when the murder took place. An individual could abuse the child and avoid having his parental rights terminated under Wis. Stat. § 48.415(5) because he had yet to be adjudicated the biological father at the time of abuse. In addition, as in the present case, an individual could begin to raise and care for his child and then abandon his child yet avoid having his rights terminated under Wis. Stat. § 48.415(1) because he was not adjudicated the biological father when the periods of abandonment occurred.

¶ 45. Therefore, we can find no support in the statute for James P.'s assertion that the parental rights of an individual who fathers a child outside a marriage attach and can be terminated *only* after the State officially recognizes him as the father. Here, it is uncontested that James P. is the biological father of Chezron. As such, he meets the definition of "parent" in the first sentence of § 48.02(13) as he is, and always was, Chezron's biological parent.

¶ 46. James P.'s final argument is that our interpretation raises due process concerns. Although he is not specific, he alludes to the fact that an individual who is the biological parent of a nonmarital child may not be aware of this fact until he is adjudicated as such, and therefore may not be aware of his legal obligations towards the child. However, this argument is a red herring in this case because § 48.415(1)(c) specifically provides an affirmative defense to the abandonment ground if an individual can establish "good cause" why he did not visit or have contact with the child.

¶ 47. Here, the circuit court specifically found, and James P. has not challenged on appeal, that he failed to establish a good cause defense. The circuit court explicitly rejected James P.'s contention that he

706

was unaware that Chezron was his child. The circuit court set forth the following factual findings:

> James P. was at the hospital when Chezron was born. His insurance paid the costs of her birth and he listed her on his medical insurance policy as his daughter. He also added Chezron to his life insurance policy as his daughter. James P. cared for Chezron and treated her as his biological daughter. Chezron called him "dad," and he considered Chezron "family."

Additionally, the circuit court highlighted that James P.'s testimony had been impeached on a number of issues and that he was not a credible witness. It noted that the testimony at trial contradicted James P.'s assertion that Chezron's mother told him the child was not his. As he does not contest any of these findings on appeal, James P. is in no position to now suggest that he was unaware that Chezron was his child.

¶ 48. Because we have concluded that James P. meets the definition of "parent" in § 48.02(13), as he is and always was Chezron's "biological parent," and the circuit court concluded that he failed to establish a good cause defense to abandonment under 48.415(1)(c), we affirm the decision of the court of appeals, which affirmed the circuit court order terminating James P.'s parental rights to Chezron. We emphasize that we do not hold, as did the circuit court, that "a man adjudicated as the biological father *has always been* the biological father and, therefore, that man has always been a 'parent' under § 48.02(13)." We merely hold that James P. satisfies the definition of "parent" in the first sentence of § 48.02(13) because he is and always was, in fact, Chezron's "biological parent."

## VI. CONCLUSION.

¶ 49. We hold that an individual who is in fact the biological father of a nonmarital child satisfies the definition of "parent" in § 48.02(13), as he is a "biological parent," notwithstanding that he has not officially been adjudicated as the child's biological father. Because such an individual satisfies the definition of "parent," he may have his parental rights terminated based on periods of abandonment that occurred prior to his official adjudication as the child's biological father, assuming he has failed to establish a "good cause" affirmative defense to the ground of abandonment.

*By the Court.*—The decision of the court of appeals is affirmed.