NORTHWEST AIRLINES, INC.,
Plaintiff-Appellant-Cross-Respondent,

v.

WISCONSIN DEPARTMENT OF REVENUE,
Defendant-Respondent-Cross-Appellant,

MIDWEST AIRLINES, INC.,
Intervening
Defendant-Respondent-Cross-Appellant.

Supreme Court

*No. 2004AP319. Oral argument December 13, 2005.
—Decided July 7, 2006.*

2006 WI 88

(Also reported in 717 N.W.2d 280.)

For the plaintiff-appellant-cross-respondent there were briefs by *Donald K. Schott, David D. Wilmoth, Kevin M. Long, Brian D. Winters*, and *Quarles & Brady LLP*, Milwaukee, and oral argument by *Donald K. Schott*.

For the defendant-respondent-cross-appellant the cause was argued by *Mary E. Burke*, assistant attorney general, with whom on the briefs was *Peggy A. Lautenschlager*, attorney general.

For the intervening defendant-respondent-cross-appellant there were briefs by *Joseph D. Kearney*,

Milwaukee; *Robert H. Friebert, William B. Guis, Matthew W. O'Neill, Michael Mishlove,* and *Friebert, Finerty & St. John, S.C.,* Milwaukee, and oral argument by *Robert H. Friebert.*

¶ 1. DAVID T. PROSSER, J. In 2001 the Wisconsin legislature created an ad valorem tax exemption for air carrier companies that satisfy either of two criteria for operating a hub facility in this state. The purpose of the exemption is to maintain Wisconsin's air transportation system, protect existing jobs, encourage the development of additional air transportation facilities, and preserve the state's competitiveness in attracting and retaining business and industry.

¶ 2. Northwest Airlines, Inc. (Northwest), an air carrier company headquartered in Minnesota, did not qualify for the ad valorem tax exemption in 2002. Had Northwest met the criteria for exemption, it would have been exempted from paying more than $1.5 million in ad valorem taxes in that year. Believing itself disadvantaged, the air carrier challenged the constitutional validity of the tax exemption. The case is before us on certification from the court of appeals[1] after the Dane County Circuit Court, John Albert, Judge, held the tax exemption unconstitutional. We reverse.

## I. THE HUB EXEMPTION
## AND PROCEDURAL HISTORY

¶ 3. In 2001 the legislature enacted an absolute exemption from ad valorem taxation for any air carrier that operates a hub facility in Wisconsin. Wis. Stat.

---

[1] Wis. Stat. § (Rule) 809.61 (2003–04).

§§ 70.11(42) and 76.02(1) (2003–04).[2] The legislature defined a hub facility in two ways:

> a. A facility at an airport from which an air carrier company operated at least 45 common carrier departing flights each weekday in the prior year and from which it transported passengers to at least 15 nonstop destinations, as defined by rule by the department of revenue, or transported cargo to nonstop destinations, as defined by rule by the department of revenue.

> b. An airport or any combination of airports in this state from which an air carrier company cumulatively operated at least 20 common carrier departing flights each weekday in the prior year, if the air carrier company's headquarters, as defined by rule by the department of revenue, is in this state.

Wis. Stat. § 70.11(42)(a)2.[3]

¶ 4. The legislature then provided in Wis. Stat. § 76.02(1) that " '[a]ir carrier company' means any person engaged in the business of transportation in aircraft of persons or property for hire on regularly scheduled flights, *except an air carrier company whose property is exempt from taxation under s. 70.11(42)(b)*." (Emphasis added.)

¶ 5. As this provision implies, the hub exemption is not limited to property physically located at an air carrier's hub facility. Instead, the exemption extends to all "[p]roperty owned by an air carrier company that

---

[2] All references to the Wisconsin Statutes are to the 2003–04 edition unless otherwise indicated.

[3] For ease of reference, we refer to the 45–flight hub definition as the Single Airport hub exemption and the 20–flight hub definition as the Headquarters hub exemption. When we use hub exemption without a modifier, we are referring to both exemptions.

operates a hub facility in this state, if the property is used in the operation of the air carrier company." Wis. Stat. § 70.11(42)(b).

¶ 6. Midwest Airlines, Inc. (Midwest) and Air Wisconsin Airlines Corp. (Air Wisconsin) qualified for the exemption in 2002. Midwest operated a hub facility as defined by the first test, the Single Airport hub exemption; Air Wisconsin operated a hub facility as defined by the second test, the Headquarters hub exemption. The Legislative Fiscal Bureau estimated that in 2002 the hub exemption relieved Midwest of nearly $2 million in ad valorem taxes, and relieved Air Wisconsin of nearly $600,000 in ad valorem taxes. Legislative Fiscal Bureau, *Tax Exemption for Air Carriers with Hub Terminal Facilities (DOT – Transportation Finance)*, Paper # 899 to Joint Committee on Finance, at 2–3 (May 29, 2001) (hereinafter Legislative Fiscal Bureau Paper # 899).

¶ 7. Northwest received its 2002 ad valorem tax assessment on October 10, 2002, and filed a summons and complaint for re-determination of its assessment in the Dane County Circuit Court on November 11, 2002. Northwest claimed the hub exemption violated (1) the Interstate Commerce Clause, Article I, Section 8 of the United States Constitution; (2) the Equal Protection Clause, Amendment XIV, Section 1 of the United States Constitution; and (3) the Uniformity Clause, Article VIII, Section 1 of the Wisconsin Constitution.

¶ 8. The named defendant, the Wisconsin Department of Revenue (DOR), filed a motion to dismiss because, inter alia, Northwest had failed to serve DOR within 30 days of receiving the assessment notice. On the same day, June 13, 2003, Northwest filed a motion for summary judgment, requesting that the circuit court declare the hub exemption unconstitutional.

209

¶ 9. The circuit court granted in part the DOR's motion to dismiss. The court held that Wis. Stat. § 76.08(1) required Northwest to serve DOR with a copy of the summons and complaint within 30 days of receiving an assessment notice and that Northwest failed to do so. Northwest did not serve DOR until January 13, 2003. Accordingly, the circuit court held that Northwest was not entitled to a re-determination of its 2002 ad valorem tax assessment and that this denial of re-determination did not deprive Northwest of its due process right to meaningful retrospective relief.

¶ 10. In addition, the circuit court ruled on Northwest's summary judgment motion. The court held that the hub exemption was a facial violation of the dormant Commerce Clause because it benefited in-state air carriers while imposing an extra burden on out-of-state air carriers. The court also concluded that the hub exemption could be severed from the ad valorem tax scheme, allowing the ad valorem tax to be imposed upon all air carriers.

¶ 11. Both Northwest and DOR appealed. Northwest appealed the circuit court's holdings that (1) the hub exemption was severable; (2) Wis. Stat. § 76.08(1) required it to *serve* DOR with a copy of the summons and complaint within 30 days; and (3) the denial of the re-determination claim did not violate Northwest's due process right to meaningful retrospective relief. DOR cross-appealed the circuit court's holding that the hub exemption violates the dormant Commerce Clause.

¶ 12. Faced with the prospect of having to pay the ad valorem tax, Midwest filed a motion to intervene. The circuit court granted Midwest leave to intervene but would not reconsider its constitutional ruling. On appeal, Midwest challenges the circuit court's holdings that (1) the hub exemption is severable; and (2) the hub

exemption violates the dormant Commerce Clause. Midwest contends that a federal statute, 49 U.S.C.A. § 40116 (2000 & West Supp. 2005), forecloses review of the constitutionality of the hub exemption under the dormant Commerce Clause. DOR joins Midwest in this argument.

¶ 13. The parties also ask us to determine whether the hub exemption violates either the Equal Protection Clause or the Uniformity Clause even though the circuit court reached neither issue.

¶ 14. We conclude: (1) 49 U.S.C.A. § 40116 precludes dormant Commerce Clause review of the hub exemption; (2) the hub exemption does not violate the Equal Protection Clause of the United States Constitution; and (3) the hub exemption does not violate the Uniformity Clause of the Wisconsin Constitution. Because we have determined that the hub exemption is valid, we need not reach the questions associated with whether Northwest complied with the procedural requirements for re-determination of its assessment. Accordingly, we reverse the circuit court's decision that the hub exemption violates the dormant Commerce Clause.

## II. BACKGROUND

¶ 15. Wisconsin taxes in-state property by means of either a general property tax or an ad valorem property tax. Wis. Stat. chs. 70 (general property tax) and 76 (ad valorem property tax). The property of all "air carrier companies"[4] is exempt from *general* property taxes. Wis. Stat. §§ 70.11(42)(b) and 70.112(4) and (6).

---

[4] As noted, an air carrier company is defined as "any person engaged in the business of transportation in aircraft of persons or property for hire on regularly scheduled flights." Wis. Stat. § 70.11(42)(a)1.

¶ 16. Wisconsin taxes air carrier companies under an ad valorem tax in Wis. Stat. ch. 76.[5] *See* Wis. Stat. §§ 76.01, 76.02, and 76.23. Each air carrier's property is valued on a company-wide basis, and a percentage of this amount is attributed to Wisconsin for purposes of calculating the ad valorem tax. Wis. Stat. § 76.07(4g)(b). As noted, not all air carrier companies are subject to an ad valorem tax. *See* Wis. Stat. § 76.02(1). Any air carrier company that operates a "hub facility,"[6] as defined by Wis. Stat. § 70.11(42)(a)2., is exempt from the ad valorem tax.

¶ 17. At present, Midwest and Air Wisconsin are the only air carrier companies that qualify for the hub exemption.

¶ 18. As initially drafted, the hub exemption was tailored to benefit Midwest. *See* Department of Revenue Fiscal Estimate to 1999 S.B. 411 (Mar. 1, 2000); Department of Transportation Fiscal Estimate to 1999

---

[5] Unlike general property taxes, which are levied and collected by towns, villages, and cities, the ad valorem tax imposed upon air carriers is levied and collected by the DOR. *Compare* Wis. Stat. § 70.05 *with* Wis. Stat. § 76.01.

[6] As noted, a "hub facility" is defined as:

 a. A facility at an airport from which an air carrier company operated at least 45 common carrier departing flights each weekday in the prior year and from which it transported passengers to at least 15 nonstop destinations, as defined by rule by the department of revenue, or transported cargo to nonstop destinations, as defined by rule by the department of revenue.

 b. An airport or any combination of airports in this state from which an air carrier company cumulatively operated at least 20 common carrier departing flights each weekday in the prior year, if the air carrier company's headquarters, as defined by rule by the department of revenue, is in this state.

Wis. Stat. § 70.11(42)(a)2.

S.B. 411 (Feb. 29, 2000). The legislature first proposed the hub exemption to induce Midwest to push forward with a nearly $1 billion expansion in Wisconsin rather than elsewhere.[7] Sarah Wyatt, *Airline won't expand in state without tax relief,* Wis. St. J., Oct. 15, 1999, at 10B (noting the combination of income and property taxes paid by Midwest in Wisconsin was two to six times greater than the amount it would pay in income and property taxes in Illinois, Michigan, Missouri, Iowa, or Minnesota); Dennis Chaptman, *Midwest Express turns attention to tax cut,* Milwaukee J. Sentinel, Feb. 15, 2000, at 1D.

¶ 19. Midwest's principal offices are in Oak Creek, Wisconsin; its primary base of operations is Milwaukee.[8] In 2000, when the legislature first considered the hub exemption, Midwest employed approximately 1,600 employees in Milwaukee. Dennis Chaptman, *Midwest Express turns attention to tax cut,* Milwaukee J. Senti-

---

[7] Wisconsin's hub exemption is one example of states using financial incentives to induce desirable behavior, promote economic development, and compete against other states for business development. Wisconsin is not alone in enacting legislation to attract air carriers to establish hub facilities. For example, Alabama has a similar tax exemption for air carriers that operate a hub facility in-state, Ala. Code § 40–9-1(24); Indiana provides a deduction from the ad valorem tax imposed upon air carriers to encourage *intrastate* flights, Ind. Code §§ 6–1.1–12.3–1 to 6–1.1–12.3–15; North Carolina grants a partial refund on sales and use taxes paid by interstate air carriers on their purchases of fuel and repair parts, N.C. Gen. Stat. § 105–164.14; and South Carolina authorizes its governor to issue bonds to pay a portion of an air carrier's expenses in acquiring or constructing a hub facility, S.C. Code Ann. §§ 55–11–500 to 55–11–520.

[8] In addition to Milwaukee, Midwest has secondary bases of operation in Omaha, Nebraska, and Kansas City, Missouri.

nel, Feb. 15, 2000, at 1D. In a press release issued two months before the hub exemption was passed, Governor Scott McCallum described the effect of Midwest upon Wisconsin's economy. Governor McCallum noted that Midwest accounted, directly or indirectly, for more than 5000 jobs in Wisconsin and generated more than $173 million in personal income in 2000. Governor Scott McCallum, Press Release (June 6, 2001) at 1.[9]

¶ 20. In 2002 ten jet airlines served Milwaukee. As a general rule, the nine airlines serving Milwaukee other than Midwest provided nonstop flights only between Milwaukee and their hub cities.[10] By contrast, Midwest provided nonstop service between Milwaukee and at least 18 cities. In 2002 Midwest had the largest share of the Milwaukee market, carrying 37.5% of passengers emplaning in Milwaukee.

¶ 21. Northwest is Midwest's strongest competitor in the Milwaukee market. In 2002 Northwest had the second largest market share in Milwaukee, carrying 18.6 percent of the passengers emplaning in Milwaukee. Northwest is a subsidiary of Northwest Airlines, Corporation, which has its principal offices in Eagan, Minnesota. Northwest is the fourth largest airline in the world and has domestic hubs in Minneapolis, Minnesota; Detroit, Michigan; and Memphis, Tennessee.

---

[9] Another study, prepared in 1999 by the Metropolitan Milwaukee Association of Commerce, reported that Midwest generated 10,617 jobs for Wisconsin and $265.5 million in personal earnings.

[10] To illustrate, a person in Milwaukee who desires to fly to Boston, New York, or Washington D.C. on Northwest will normally have to stop, and likely change planes, in Detroit or Minneapolis before proceeding to his or her final destination.

From 2000 to 2002 Northwest operated an average of 68 flights per day into and out of Wisconsin, flying out of five Wisconsin airports.

¶ 22. In the course of considering the tax exemption, the legislature enlarged the definition of a hub facility to include the Headquarters hub exemption, allowing Air Wisconsin to qualify for an exemption from the ad valorem tax. *See* 2001 Wisconsin Act 16; Dennis Chaptman, *Lawmakers haggle over tax breaks for airlines,* Milwaukee J. Sentinel, Mar. 30, 2000, at 1D. Air Wisconsin is a regional and commuter airline founded in 1965 and headquartered in Appleton.[11]

¶ 23. Since 2001 Northwest has paid its ad valorem tax assessments under protest, challenging the validity of the hub exemption each year. Northwest challenges the hub exemption on the grounds that it offers Midwest and Air Wisconsin a competitive advantage. In 2000, the last year in which Midwest and Air Wisconsin paid an ad valorem tax, Midwest paid $1,953,300.94; Air Wisconsin paid $577,062.34; and Northwest paid $1,653,437.20. In 2002 Northwest paid $1,562,968.23 in ad valorem tax.

¶ 24. After the circuit court denied Northwest's claim for a re-determination of its 2002 assessment but declared the hub exemption unconstitutional, Midwest intervened, and Northwest, DOR, and Midwest all appealed. The City and County of Milwaukee and the Metropolitan Milwaukee Association of Commerce filed amicus briefs in support of the hub exemption. The court of appeals certified the case, and we granted certification.

---

[11] Air Wisconsin, unlike Midwest, did not intervene and is not a party in this case.

## III. STANDARD OF REVIEW

¶ 25. This case presents questions of law involving statutory interpretation and a challenge to the constitutionality of a tax exemption, which we review independent of the circuit court, though benefiting from its analysis. *State v. James P.,* 2005 WI 80, ¶ 16, 281 Wis. 2d 685, 698 N.W.2d 95 (statutory interpretation); *Nankin v. Village of Shorewood,* 2001 WI 92, ¶ 10, 245 Wis. 2d 86, 630 N.W.2d 141 (constitutional challenge to a statute).

¶ 26. "All legislative acts are presumed constitutional and every presumption must be indulged to uphold the law if at all possible." *Norquist v. Zeuske,* 211 Wis. 2d 241, 250, 564 N.W.2d 748 (1997). This presumption of constitutionality is the strongest for tax statutes. *Id.* To overcome the presumption of constitutionality, the party challenging the statute must prove it unconstitutional beyond a reasonable doubt. *Id.*[12]

## IV. DISCUSSION

A. Does 49 U.S.C.A. § 40116 Foreclose Dormant Commerce Clause Review of the Hub Exemption?

¶ 27. Northwest's principal challenge to the hub exemption is that it violates the Interstate Commerce Clause. Article I, Section 8, clause 3 of the United States Constitution gives Congress the power "[t]o

---

[12] The standards of review for an equal protection challenge and a uniformity clause challenge are discussed elsewhere in the opinion. *See* ¶¶ 54, 55, 62, 65, *infra.*

regulate commerce . . . among the several states . . . ."
Courts have consistently held that there is a negative
implication to this affirmative grant of power to Con-
gress that restricts the ability of states to regulate
interstate commerce. *Camps Newfound/Owatonna, Inc.
v. Town of Harrison, Maine,* 520 U.S. 564, 571 (1997);
*Olstad v. Microsoft Corp.,* 2005 WI 121, ¶ 30, 284 Wis.
2d 224, 700 N.W.2d 139. This restriction upon the
states, called either the negative or dormant Commerce
Clause, "prohibits economic protectionism—that is,
'regulatory measures designed to benefit in-state eco-
nomic interests by burdening out-of-state competi-
tors.' " *Fulton Corp. v. Faulkner,* 516 U.S. 325, 330
(1996). Under the dormant Commerce Clause, courts
"protect[] the free flow of commerce, and thereby safe-
guard[] Congress' latent power from encroachment by
the several States[]" when Congress has not affirma-
tively exercised its Commerce Clause power. *Merrion v.
Jicarilla Apache Indian Tribe,* 455 U.S. 130, 154 (1982).

¶ 28. The Commerce Clause is a grant of plenary
power to Congress to regulate interstate commerce.
*Fed'l Energy Regulatory Comm'n v. Mississippi,* 456
U.S. 742, 753 (1982). As part of its Commerce Clause
power, Congress may "redefine the distribution of
power over interstate commerce." *S. Pac. Co. v. State of
Ariz. ex rel. Sullivan,* 325 U.S. 761, 769 (1945). Thus, by
affirmative legislation in an area, Congress can autho-
rize the states to regulate interstate commerce in a
manner that would otherwise violate the dormant Com-
merce Clause. *Id.*

¶ 29. Within the scope of congressional authoriza-
tion, state regulation of interstate commerce is "invul-
nerable to Commerce Clause challenge." *W. & S. Life*

*Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 652–53 (1981). Describing the judiciary's role in applying the dormant Commerce Clause, the Supreme Court has said: "When Congress has struck the balance it deems appropriate, the courts are no longer needed to prevent States from burdening commerce, and it matters not that the courts would invalidate the state tax or regulation under the Commerce Clause in the absence of congressional action." *Merrion,* 455 U.S. at 154.

¶ 30. A threshold question in many dormant Commerce Clause cases is whether Congress has exercised its Commerce Clause power in a field in which case judicial review is precluded. *See Granholm v. Heald,* 544 U.S. 460, 476–89 (2005); *Wyoming v. Oklahoma,* 502 U.S. 437, 457–58 (1992); *Ne. Bancorp, Inc. v. Bd. of Governors,* 472 U.S. 159, 168–75 (1985); *South-Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 87–93 (1984); *Merrion,* 455 U.S. at 154–56; *W. & S. Life Ins. Co.,* 451 U.S. at 652–53. For a statute to preclude dormant Commerce Clause review, congressional intent must be unmistakably clear. *E.g., Wyoming,* 502 U.S. at 458; *Wunnicke,* 467 U.S. at 91–92; *see also Hillside Dairy, Inc. v. Lyons,* 539 U.S. 59, 66 (2003) (requiring Congress to have "clearly expressed" its intent to permit states to discriminate against interstate commerce).

¶ 31. Whether Congress has given its consent to state regulations that would otherwise run afoul of the dormant Commerce Clause requires a "reverse-preemption" analysis. *See* 1 Laurence H. Tribe, *American Constitutional Law* 1039 (3d ed. 2000). Whereas preemption operates on the presumption that state laws are constitutional unless Congress enacts legislation to the contrary, state laws that discriminatorily

218

regulate or unduly burden interstate commerce are presumptively unconstitutional unless Congress enacts legislation to the contrary. *Id.*

¶ 32. In this case we apply a reverse-preemption analysis to discern whether Congress has consented to differential taxation of air carriers. We first examine the text of 49 U.S.C.A. § 40116 to determine whether Congress has expressly consented to differential taxation among air carriers. *Cf. Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 299–00 (1988) (describing the first stage in standard preemption analysis as whether Congress made explicit the extent to which state law is preempted). Only if § 40116 fails to demonstrate that Congress gave its express consent to differential taxation of air carrier transportation property do we examine legislative history and extrinsic sources to determine whether Congress implicitly consented to differential taxation of air carriers. *Cf. id.* at 300; *Ne. Bancorp, Inc.,* 472 U.S. at 169 (noting that although the face of the statute did not establish with unmistakable clarity congressional consent to discriminatory regulations, the legislative history demonstrated congressional consent).

¶ 33. Three subsections of 49 U.S.C.A. § 40116 are relevant to our inquiry:

> (b) Prohibitions. Except as provided in subsection (c) of this section and section 40117 of this title, a State, a political subdivision of a State, and any person that has purchased or leased an airport under section 47134 of this title, may not levy or collect a tax, fee, head charge, or other charge on—
>
> (1) an individual traveling in air commerce;
>
> (2) the transportation of an individual traveling in air commerce;
>
> (3) the sale of air transportation; or

(4) the gross receipts from that air commerce or transportation.

. . . .

(d) Unreasonable burdens and discrimination against interstate commerce.

(1) In this subsection—

(A) "air carrier transportation property" means property (as defined by the Secretary of Transportation) that an air carrier providing air transportation owns or uses.

. . . .

(D) "commercial and industrial property" means property (except transportation property and land used primarily for agriculture or timber growing) devoted to a commercial or industrial use and subject to a property tax levy.

(2)(A) A State, political subdivision of a State, or authority acting for a State or political subdivision may not do any of the following acts because those acts unreasonably burden and discriminate against interstate commerce:

(i) assess air carrier transportation property at a value that has a higher ratio to the true market value of the property than the ratio that the assessed value of other commercial and industrial property of the same type in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(ii) levy or collect a tax on an assessment that may not be made under clause (i) of this subparagraph.

(iii) levy or collect an ad valorem property tax on air carrier transportation property at a tax rate greater

220

than the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(iv) levy or collect a tax, fee, or charge, first taking effect after August 23, 1994, exclusively upon any business located at a commercial service airport or operating as a permittee of such an airport other than a tax, fee, or charge wholly utilized for airport or aeronautical purposes.

. . . .

(e) Other allowable taxes and charges. Except as provided in subsection (d) of this section, a State or political subdivision of a State may levy or collect—

(1) taxes (except those taxes enumerated in subsection (b) of this section), including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services; and

(2) reasonable rental charges, landing fees, and other service charges from aircraft operators for using airport facilities of an airport owned or operated by that State or subdivision.

■■

¶ 34. Midwest and DOR contend that 49 U.S.C.A. § 40116 constitutes "unmistakably clear" evidence that Congress intended to preclude dormant Commerce Clause review of state taxation of air carriers. Midwest and DOR reason as follows. First, § 40116(b) and (d) prohibit eight tax practices with regard to air carriers.[13] Second, § 40116(e) clearly authorizes state taxes, including property taxes, except those proscribed in

---

[13] 49 U.S.C.A. § 40116(c) constitutes another prohibition on state and local taxation. It reads:

A State or political subdivision of a State may levy or collect a tax on or related to a flight of a commercial aircraft or an activity or

§ 40116(b) or (d). Therefore, because property tax exemptions among air carriers are not expressly prohibited, Midwest and DOR conclude that Congress authorized exemptions like the hub exemption and precluded judicial review of tax exemptions under the dormant Commerce Clause.[14]

¶ 35. Northwest disagrees and argues that 49 U.S.C.A. § 40116 does not demonstrate that Congress intended to preclude dormant Commerce Clause review. It draws vastly different conclusions from the text of § 40116. Northwest argues that § 40116(b) and (d) preempt traditional state powers of taxation and that § 40116(e) is merely a non-preemption or saving clause, which was intended to preserve then-existing state tax powers rather than to confer upon the states new powers to tax. According to Northwest, § 40116 supplements but does not replace dormant Commerce Clause review; thus, taxes imposed upon air carriers must survive scrutiny under both § 40116 *and* the dormant Commerce Clause.

¶ 36. We cannot accept Northwest's reading of the statute. To evaluate the parties' arguments, we begin with the statutory text to determine whether Congress made unmistakably clear its intent to authorize tax exemptions like the hub exemption, and thereby fore-

---

service on the aircraft only if the aircraft takes off or lands in the State or political subdivision as part of the flight.

§ 40116(c).

[14] Precluding judicial review of tax exemptions under the dormant Commerce Clause does not foreclose judicial review of tax exemptions on *other* constitutional grounds. *W. & S. Life Ins. Co.*, 451 U.S. at 655–56. However, when a tax statute involving interstate commerce is challenged on other grounds, the statute is presumed constitutional.

close dormant Commerce Clause review. We employ the same methodology to interpret a federal statute as we do when we interpret a state statute; that is, we start with the text of the statute. If the statute's meaning is plain, then our inquiry ordinarily stops. *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. *Accord Dodd v. United States,* 545 U.S. 353, 360 (2005); *Lamie v. United States Trustee,* 540 U.S. 526, 534 (2004); *Hartford Underwriters Ins. Co. v. Union Planters Bank,* 530 U.S. 1, 6 (2000) (when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms). Because we conclude that 49 U.S.C.A. § 40116 demonstrates—with unmistakable clarity—congressional consent to allow states to impose differential taxes among air carriers, we need not resort to extrinsic sources.[15]

¶ 37. The statutory structure of 49 U.S.C.A. § 40116 creates two types of taxes on air carriers: taxes that are prohibited and taxes that are authorized. Taxes that are not prohibited under either subsection (b) or subsection (d) are authorized by subsection (e).[16] We

---

[15] We note that the briefs and appendices submitted by the parties are replete with legislative history. Our independent review of the legislative history demonstrates that documents exist that reasonably support the positions of both Northwest and Midwest and DOR. We do not, however, turn to legislative history to find ambiguity. *State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶ 51, 271 Wis. 2d 633, 681 N.W.2d 110; *Fox v. Catholic Knights Ins. Soc'y,* 2003 WI 87, ¶ 19, 263 Wis. 2d 207, 665 N.W.2d 181.

[16] Although subsection (c) also constrains the ability of states to tax air carriers, we will not consider it here because it is not relevant to this case.

must determine, therefore, whether the hub exemption fits within any of the prohibited provisions, and if it does not, whether subsection (e) evinces congressional intent to preclude dormant Commerce Clause review.

¶ 38. The parties agree that the hub exemption does not contravene 49 U.S.C.A. § 40116(b), which prohibits a state from levying or collecting a tax on "(1) an individual traveling in air commerce; (2) the transportation of an individual traveling in air commerce; (3) the sale of air transportation; or (4) the gross receipts from that air commerce or transportation." We agree that subsection (b) does not prohibit ad valorem taxes upon air carriers. *See Aloha Airlines, Inc. v. Dir. of Taxation of Hawaii,* 464 U.S. 7, 12 (1983).

¶ 39. The parties' real dispute centers on the relationship of 49 U.S.C.A. § 40116(d) to § 40116(e). Subsection (d) deems certain methods of calculating a property tax or an ad valorem tax "[u]nreasonable burdens and discrimination against interstate commerce." Subsection (d) constrains (1) the assessment ratio states may use to calculate the taxable value of air carrier property, § 40116(d)(2)(A)(i) and (ii); and (2) the tax rate states may use to calculate an ad valorem tax on air carrier property, § 40116(d)(2)(A)(iii). Subsection (d) requires that neither the assessment ratio nor the tax rate for the property of air carriers be greater than the assessment ratio or tax rate of "commercial and industrial property" in the assessment jurisdiction.

¶ 40. At the same time, 49 U.S.C.A. § 40116(e) authorizes states to levy and collect property taxes upon air carriers, "[e]xcept as provided in subsection (d)[.]"

¶ 41. The argument presented by Midwest and DOR turns on how 49 U.S.C.A. § 40116(d)(1)(D) defines "commercial and industrial property." "Commercial and

224

industrial property" means "property (*except transportation property* and land used primarily for agriculture or timber growing) devoted to a commercial or industrial use and *subject to a property tax levy*." 49 U.S.C.A. § 40116(d)(1)(D) (emphasis added). Discrimination requires differential treatment of two otherwise comparable groups. For purposes of § 40116(d), whether a state tax impermissibly discriminates against air carriers is determined by comparing the property tax assessment ratio and the ad valorem property tax rate of "air carrier transportation property" with the assessment ratio and tax rate of "commercial and industrial property." "Commercial and industrial property" supplies the comparison class by which discrimination against air carriers is measured.

¶ 42. Northwest argues the hub exemption discriminates against interstate commerce because it results in a different tax rate being applied to Midwest and Air Wisconsin from all other air carriers. Midwest and DOR emphasize, however, that the ad valorem tax rate imposed upon Midwest and Air Wisconsin is irrelevant because the property of the two air carriers is both "transportation property" and exempt property. This means, they contend, that the property of Midwest and Air Wisconsin is not part of the comparison class by which discrimination against an air carrier is measured under 49 U.S.C.A. § 40116(d).

¶ 43. Northwest discounts these exclusions from the comparison class. Northwest first contends that transportation property had to be excluded to "make possible a sensible, non-circular comparison class[.]" Second, Northwest acknowledges that exempt property is not part of the comparison class, but, relying upon *Department of Revenue of Oregon v. ACF Industries, Inc.,* 510 U.S. 332 (1994), it argues that the hub

225

exemption is contrary to the anti-discriminatory purpose of 49 U.S.C.A. § 40116.

¶ 44. Ultimately, we agree with Midwest and DOR. Although we acknowledge the need for a meaningful comparison class, we believe that Congress determined, first, that air carrier transportation property must not be assessed or taxed at a higher rate than other commercial property (implying that it could be assessed and taxed at a lower rate) and, second, air carrier transportation property need not be assessed and taxed the same as other transportation property (e.g., motor carrier and railroad property). *See Am. Airlines, Inc. v. County of San Mateo,* 912 P.2d 1198, 1217 (Cal. 1996) (concluding that assessing the property of air carriers at 100 percent of fair market value while assessing the property of railroads at 70 percent of fair market value did *not* violate 49 U.S.C.A. § 40116(d)). Moreover, we do not find persuasive Northwest's reliance upon *ACF Industries* to minimize the importance of excluding exempt property from the comparison class.

¶ 45. In *ACF Industries* eight railroads challenged Oregon's ad valorem personal property tax, claiming that it violated the Railroad Revitalization and Regulatory Reform Act (4–R Act) (49 U.S.C.A. § 11501), the model for 49 U.S.C.A. § 40116(d).[17] *ACF Indus.,* 510

---

[17] The text of 49 U.S.C.A. § 40116(d) is modeled upon the Railroad Revitalization and Regulatory Reform Act (4–R Act) (49 U.S.C.A. § 11501) and the Motor Carrier Act (49 U.S.C.A. § 14502). Courts have consistently relied upon cases interpreting the 4–R act to interpret § 40116(d) and vice versa. *E.g., Am. Airlines, Inc. v. County of San Mateo,* 912 P.2d 1198, 1207 (Cal. 1996) (collecting cases); *see also W. Air Lines, Inc. v. Bd. of Equalization,* 480 U.S. 123, 130–131 (1987).

U.S. at 335. Oregon imposed an ad valorem personal property tax that applied to railroads but created a number of exemptions for non-railroad business property for which the railroads did not qualify. These included exemptions for business personal property, non-farm business inventories, livestock, and agricultural products in the possession of farmers. *Id.* The Supreme Court upheld the exemptions, concluding that "a State may grant exemptions from a generally applicable ad valorem property tax without subjecting the taxation of railroad property to challenge under the relevant provision of the 4–R Act[.]" *Id.*

¶ 46. The Supreme Court's decision in *ACF Industries* turned upon the definition of "commercial and industrial property" in the 4–R Act, which, like the definition in 49 U.S.C.A. § 40116(d)(1)(D), defines the comparison class for evaluating discrimination against railroads. *See id.* at 341–42. Like the definition of "commercial and industrial property" in § 40116(d)(1)(D), the 4–R Act excludes both transportation property and exempt property from the comparison class. 49 U.S.C.A. § 11501(a)(4).[18] The Court found that principles of federalism made necessary the exclusion of exempt property from the comparison class, because the power to grant tax exemptions is among the traditional powers of the states and because the states must be allowed to grant "tax exemptions to encourage industrial development." *Id.* at 345–46. Thus, the Court explained that the 4–R Act would not prohibit tax exemptions unless the exemptions result in all property

[18] The 4–R Act defines "commercial and industrial property" as "property, other than transportation property and land used primarily for agricultural purposes or timber growing, devoted to a commercial or industrial use and subject to a property tax levy." 49 U.S.C.A. § 11501(a)(4).

other than railroad property being exempt, in which case "it might be incorrect to say that the State 'exempted' the nontaxed property." *Id.* at 346. "Rather, one could say that the State had singled out railroad property for discriminatory treatment." *Id.* at 346–47.

¶ 47. Northwest inverts the holding in *ACF Industries,* claiming the hub exemption targets select air carriers. We acknowledge that the hub exemption is presently available to only two air carriers. However, under *ACF Industries,* state tax exemptions do *not* violate the 4–R Act, and by extension 49 U.S.C.A. § 40116, as long as the amount of property made exempt does not dwarf the amount of property subject to tax. In the present case, the hub exemption is limited, like the exemptions in *ACF Industries,* and does not warrant the conclusion that the legislature "singled out" Northwest for discriminatory treatment. Because § 40116(d)(1)(D) defines "commercial and industrial property" to exclude (1) transportation property, and (2) property not subject to a property tax levy, and because the property of Midwest and Air Wisconsin fits both exceptions to the comparison class, we conclude that the assessment ratio and tax rate at which the property of Midwest and Air Wisconsin are taxed is irrelevant. *See ACF Indus., Inc.,* 510 U.S. at 342. Northwest cannot establish that the hub exemption results in a violation of § 40116(d).

¶ 48. The Supreme Court's holding in *ACF Industries* bolsters our conclusion that 49 U.S.C.A. § 40116 evinces congressional intent to (1) permit differential taxation of transportation property, including—by extension—differential taxation among air carriers;[19]

[19] The Supreme Court has previously upheld the power of state and local governments to impose differential fees upon

228

and (2) exclude the effect of property tax exemptions on the average property tax rate of the comparison class. Consequently, the hub exemption is not prohibited by either § 40116(b) or (d); and § 40116(e) authorizes the states to create property tax exemptions for transportation property without exposing these exemptions to challenge under the dormant Commerce Clause.

¶ 49. When Congress enacted 49 U.S.C.A. § 40116(b) and (d), Congress intended to replace the uncertainty and quagmire[20] of dormant Commerce Clause review with the relative certainty of statutory tests that protect against discriminatory taxation. As the Supreme Court has recognized, its dormant Commerce Clause cases have resulted in a "case-by-case approach [that] has left 'much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation.' " *Boston Stock Exchange v. State Tax Comm'n,* 429 U.S. 318, 329 (1977) (quoting *Nw. States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 457 (1959)). A tax device, with respect to the property of air carrier companies, that does not conflict with § 40116(b) or (d) should not be required to run through an additional

aircraft operators. In *Northwest Airlines, Inc. v. County of Kent, Michigan,* 510 U.S. 355, 358–60 (1994), the Court concluded that charging commercial airlines 100 percent of the user fees and costs allocated to them, but charging general aviation (corporate and privately owned aircraft) 20 percent of the costs allocated to it, did not violate 49 U.S.C.A. § 40116.

[20] The Supreme Court itself has referred to its dormant Commerce Clause jurisprudence as a "quagmire." *See Boston Stock Exchange v. State Tax Comm'n,* 429 U.S. 318, 329 (1977) (quoting *Nw. States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 458 (1959)).

judicial gauntlet where it is subjected to a different standard of review than is normally applied to a tax statute.

¶ 50. At least two features of 49 U.S.C.A. § 40116 support this conclusion. First, the relationship between § 40116(d) and § 40116(e) suggests Congress employed reasoning analogous to that which underlies the canon of construction expressio unius est exclusio alterius. The expressio unius canon is an interpretive guide meaning that the expression of one thing in a statute excludes another that is not stated. *Motola v. LIRC,* 219 Wis. 2d 588, 605, 580 N.W.2d 297 (1998). Congress specifically enumerated eight prohibited tax practices and provided that all other practices are "allowable." Accordingly, we conclude that because the hub exemption does not run afoul of § 40116(d), Congress unambiguously authorized forms of taxation like Wisconsin's ad valorem tax upon air carriers.

¶ 51. Second, in evaluating whether Congress has exercised its Commerce Clause power in the field of state taxation of air carriers, we find it significant that Congress entitled 49 U.S.C.A. § 40116(d), "Unreasonable burdens and discrimination against interstate commerce." This title invokes the same test used in dormant Commerce Clause review, demonstrating—with unmistakable clarity—that Congress intended to exercise its Commerce Clause power in the field of state taxation of air carriers and thereby preclude dormant Commerce Clause review.

¶ 52. Congress intended to allow state taxation of air carriers but also prevent unfair methods of taxation. In 49 U.S.C.A. § 40116(b) and (d) it enumerated the unfair methods of taxation. When Congress enacted § 40116, its power under the Commerce Clause ceased to be dormant in the field of state taxation of air

carriers. *Cf. Ne. Bancorp, Inc.,* 472 U.S. at 174 ("When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause."); *Wardair Canada, Inc. v. Fla. Dep't of Revenue,* 477 U.S. 1, 9 (1986) (noting that when the federal government affirmatively acts, dormant Commerce Clause analysis is not warranted). Congress prohibited a number of taxes and types of tax assessment and collection practices. 49 U.S.C.A. § 40116(b) and (d). Congress also authorized the states to impose any type of tax and to use any tax assessment or collection practice not prohibited by § 40116(b) or (d). 49 U.S.C.A. § 40116(e). Because § 40116(e) authorizes the states to collect property taxes from air carriers, and because the hub exemption does not fall within any of the assessment or collection practices prohibited by the statute, we conclude the hub exemption is not subject to dormant Commerce Clause review.

¶ 53. Even though we have concluded that 49 U.S.C.A. § 40116 precludes review of the hub exemption under the dormant Commerce Clause, we must determine whether the hub exemption contravenes either the Equal Protection Clause of the United States Constitution or the Uniformity Clause of the Wisconsin Constitution. *See W. & S. Life Ins. Co.,* 451 U.S. at 655–56 (1981).

B. Does the Hub Exemption Violate the Equal Protection Clause?

¶ 54. State tax classifications require only a rational basis to satisfy the Equal Protection Clause. *Gen. Motors Corp. v. Tracy,* 519 U.S. 278, 311 (1997). "[I]n taxation, even more than in other fields, legislatures

possess the greatest freedom in classification." *Id.* To survive an equal protection challenge, a classification made by the legislature that does not concern a suspect class or implicate a fundamental right must bear a rational relationship to a legitimate government interest. *Ferdon v. Wis. Patients Compensation Fund,* 2005 WI 125, ¶¶ 60–65, 284 Wis. 2d 573, 701 N.W.2d 440; *State v. Hezzie R.,* 219 Wis. 2d 848, 894, 580 N.W.2d 660 (1998).

¶ 55. Since the hub exemption implicates neither a suspect class nor a fundamental right, we will uphold the classifications as reasonable if, under any state of facts that can be reasonably conceived, the classification advances a legitimate governmental purpose. *Ferdon,* 284 Wis. 2d 573, ¶¶ 71–72 & n.77; *Aicher v. Wis. Patients Compensation Fund,* 2000 WI 98, ¶ 57, 237 Wis. 2d 99, 613 N.W.2d 849; *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 74, 205 N.W.2d 784 (1973).

██

¶ 56. The Single Airport hub exemption classifies air carriers into two groups: those that operate at least 45 daily flights out of a single Wisconsin airport to at least 15 nonstop destinations versus those that operate less than 45 daily flights out of a single Wisconsin airport and/or that fly to less than 15 nonstop destinations. *See* Wis. Stat. § 70.11(42)(a)2.a. The Headquarters hub exemption also classifies air carriers into two groups: those whose corporate headquarters are in Wisconsin and operate at least 20 common carrier departing flights each weekday versus those whose corporate headquarters are not in Wisconsin and/or do not operate at least 20 common carrier departing flights each weekday. § 70.11(42)(a)2.b. The legislature chose to classify air carriers based on the amount and type of

business activity they conduct in Wisconsin. We must accept the classifications adopted by the legislature "unless we can say that [they are] very wide of any reasonable mark." *Stanhope v. Brown County,* 90 Wis. 2d 823, 843 n.11, 280 N.W.2d 711 (1979) (quoting *Louisville Gas & Elec. Co. v. Coleman,* 277 U.S. 32, 41 (1928)).

¶ 57. The legislature could have rationally concluded that a number of legitimate governmental purposes are advanced by exempting air carriers that conduct a minimum level of business in Wisconsin or that are headquartered in Wisconsin. The Legislative Fiscal Bureau documented many of the expected benefits of the hub exemption in a summary of the 2001–2003 budget. Legislative Fiscal Bureau Paper # 899.

¶ 58. The Legislative Fiscal Bureau noted the hub exemption would likely help retain an existing hub facility in Wisconsin or might encourage additional air carriers to expand in Wisconsin. *Id.* at 2–3. Expected benefits of a hub facility included: (1) more nonstop flights to and from the state, which would encourage existing business to remain in-state and help attract new businesses to the state; (2) an increase of all flights to and from the state; and (3) an increase in jobs in the state. *Id.*

¶ 59. Three historical facts demonstrate the rational basis for the belief that the hub exemption was necessary to protect Wisconsin's transportation infrastructure and economy. First, in the early 1990s, Northwest downsized its Wisconsin presence, opting to expand its operations in Minnesota, in response to a public financing and incentive package of approxi-

mately $761 million.[21] Minnesota Legislative Reference Library, *Resources on Minnesota Issues Northwest Airlines and the State of Minnesota,* http://www.leg.state. mn.us/lrl/issues/nwa.asp (last visited June 30, 2006). When Northwest reduced its Wisconsin presence, Milwaukee lost about 100 jobs. The legislature could have reasonably believed that the hub exemption would guard against the loss of more jobs and prevent a further drop in the number of flights to and from Wisconsin.

¶ 60. Second, at the time the legislature drafted and passed the hub exemption, Midwest was planning a nearly $1 billion expansion. Dennis Chaptman, *Midwest Express turns attention to tax cut,* Milwaukee J. Sentinel (Feb. 15, 2000), at 1D. Midwest, however, was undecided about where to expand. *Id.* The legislature could have reasonably believed that the hub exemption would influence Midwest to expand in Wisconsin.

¶ 61. Third, Air Wisconsin was also planning to expand its operations. Avrum D. Lank, *Panel OKs airlines tax break,* Milwaukee J. Sentinel (Feb. 7, 2001), at 1D. Like Midwest, Air Wisconsin was uncertain about where it would expand: Wisconsin, Illinois, or Indiana. *Id.* Again, the legislature could have reasonably believed that the hub exemption would influence Air Wisconsin to expand in Wisconsin. In short, we conclude that the legislature could have reasonably determined that creating the hub exemption would help

[21] Minnesota initially offered Northwest a financial assistance package of $838 million before the parties agreed upon a package of $761 million. Minnesota Legislative Reference Library, *Resources on Minnesota Issues Northwest Airlines and the State of Minnesota,* http://www.leg.state.mn.us/lrl/ issues/nwa.asp (last visited June 30, 2006).

retain air carriers with a Wisconsin hub facility, which would bolster economic development in Wisconsin, a legitimate governmental purpose.

## C. Does the Hub Exemption Violate the Uniformity Clause?

¶ 62. The Uniformity Clause of the Wisconsin Constitution provides: "The rule of taxation shall be uniform . . . . Taxes shall be levied upon such property . . . as the legislature shall proscribe." Wis. Const. art. VIII, § 1. The Uniformity Clause requires that there be one class of taxable property and that all property within that class must, as nearly as practicable, be taxed uniformly, unless otherwise provided in Article VIII, Section 1. *See Noah's Ark Family Park v. Bd. of Review,* 210 Wis. 2d 301, 317–18, 565 N.W.2d 230 (Ct. App. 1997) *aff'd* 216 Wis. 2d 387, 390, 573 N.W.2d 852 (1998) (adopting the analysis of the court of appeals). We have consistently held that a tax conforms to the Uniformity Clause if it meets the following standards:

1. For direct taxation of property, under the uniformity rule there can be but one constitutional class.

2. All within that class must be taxed on a basis of equality so far as practicable and all property taxed must bear its burden equally on an ad valorem basis.

3. *All property not included in that class must be absolutely exempt from property taxation.*

4. Privilege taxes are not direct taxes on property and are not subject to the uniformity rule.

5. *While there can be no classification of property for different rules or rates of property taxation, the legisla-*

235

*ture can classify as between property that is to be taxed and that which is to be wholly exempt, and the test of such classification is reasonableness.*

6. There can be variations in the mechanics of property assessment or tax imposition so long as the resulting taxation shall be borne with as nearly as practicable equality on an ad valorem basis with other taxable property.

*State ex rel. Ft. Howard Paper Co. v. State Lake Dist. Bd. of Review,* 82 Wis. 2d 491, 506, 263 N.W.2d 178 (1978) (quoting *Gottlieb v. City of Milwaukee,* 33 Wis. 2d 408, 424, 147 N.W.2d 633, 641 (1967)) (emphasis added).

¶ 63. Northwest argues the hub exemption arbitrarily distinguishes between itself and Midwest because there is no meaningful basis for any distinction. Thus, Northwest concludes, the distinction made by the hub exemption cannot bear a reasonable relationship to a legitimate governmental purpose.

¶ 64. DOR counters that the legislature is free to tax some property and wholly exempt other property as long as the basis for classifying the property differently is reasonably related to a legitimate governmental purpose. DOR argues the hub exemption advances the legitimate governmental purpose of promoting a robust air transportation system in Wisconsin, a vital component of a strong economy. DOR notes the hub exemption (1) encourages airlines to add or retain non-stop flights from Wisconsin, which has a positive impact on economic development; (2) encourages airlines to expand or remain in Wisconsin, generally; and (3) generates and retains jobs in Wisconsin.

¶ 65. We conclude there is no argument that can prove beyond a reasonable doubt that the hub exemp-

tion violates the Uniformity Clause. *Norquist,* 211 Wis. 2d at 250; *Bd. of Trustees of Lawrence Univ. v. Outagamie County,* 150 Wis. 244, 246, 136 N.W. 619 (1912). "All legislative acts are presumed constitutional and every presumption must be indulged to uphold the law if at all possible." *Norquist,* 211 Wis. 2d at 250. This is especially true where the challenged statute involves a tax measure, because the presumption of constitutionality is the strongest for taxation-related statutes. *Id.*

■■

¶ 66. The Uniformity Clause grants the legislature the right to select some property for taxation and to totally omit or exempt other property. *Gottlieb,* 33 Wis. 2d at 420. The only limitation upon the legislature's authority to exempt property is that the distinction between taxed and wholly exempt property must bear "a reasonable relation to a legitimate purpose of government[.]" *Madison Gen. Hosp. Ass'n v. City of Madison,* 92 Wis. 2d 125, 129–30, 284 N.W.2d 603 (1979). For the reasons stated under the equal protection analysis, we conclude the classifications made by the hub exemption are rationally related to the legitimate governmental purpose of ensuring the vitality of the Wisconsin economy.

## V. CONCLUSION

¶ 67. We conclude: (1) 49 U.S.C.A. § 40116 precludes dormant Commerce Clause review of the hub exemption; (2) the hub exemption does not violate the Equal Protection Clause of the United States Constitution; and (3) the hub exemption does not violate the Uniformity Clause of the Wisconsin Constitution. Finally, because we have determined that the hub exemption is valid, we need not reach the questions associated

with whether Northwest complied with the procedural requirements for re-determination of its assessment. Accordingly, we reverse the circuit court's decision that the hub exemption violates the dormant Commerce Clause.

*By the Court.*—The order of the circuit court is reversed.

¶ 68. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). "The very purpose of the Commerce Clause was to create an area of free trade among the several States."[1] The Wisconsin tax system favoring a Wisconsin hub carrier is a "homer," that is, it favors home air carrier companies. Whatever else can be said about Wis. Stat. § 70.11(42), it flies in the face of the purpose of the Commerce Clause.

¶ 69. The majority opinion concludes that 49 U.S.C. § 40116 (2000)[2] precludes Commerce Clause review of the hub exemption for ad valorem taxation in Wis. Stat. § 70.11(42) (2003–04).[3] Applying the test that the majority opinion sets forth regarding when a federal statute precludes Commerce Clause review of a state tax law, I conclude that Congress has not made it "unmistakably clear" that § 40116 authorizes the discriminatory tax created by the Wisconsin tax system favoring a Wisconsin hub air carrier company. The Wisconsin tax system favoring a Wisconsin hub air carrier company must therefore be analyzed to determine whether it imposes an impermissible burden on interstate commerce. Because I conclude that the Wisconsin tax system favoring a Wisconsin hub carrier

---

[1] *McLeod v. J.E. Dilworth Co.*, 322 U.S. 327, 330 (1944).

[2] Current through June 16, 2006.

[3] All references to the Wisconsin Statutes are to the 2003–04 version.

imposes an impermissible burden on interstate commerce, interfering with the very purpose of the Commerce Clause, I dissent.

I

¶ 70. The first step in determining whether a state statute interferes with Congress's authority to regulate interstate commerce is to determine whether Congress has authorized the type of statute at issue. A statute is spared review under the implied limitations of the Commerce Clause[4] when Congress has provided "unmistakably clear" direction that a state statute is exempt from such review.[5] "When Congress has struck the balance it deems appropriate, the courts are no

[4] Courts and commentators have variously described the type of Commerce Clause jurisprudence at issue in this case as the "dormant" Commerce Clause, the "negative implications" of the Commerce Clause, and the "implied limitations" of the Commerce Clause. These terms are interchangeable.

[5] *Maine v. Taylor,* 477 U.S. 131, 139 (1986) (citing *S.-Cent. Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 91 (1984)) ("[The United States Supreme Court] has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been 'unmistakably clear.' "); *see also Wyoming v. Oklahoma,* 502 U.S. 437, 458 (1992) ("Congress must manifest its unambiguous intent before a federal statute will be read to permit or to approve such a violation of the Commerce Clause . . . ."); *S.-Cent. Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 91 (1984) ("There is no talismanic significance to the phrase 'expressly stated,' however; it merely states one way of meeting the requirement that for a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear. The requirement that Congress affirmatively contemplate otherwise invalid state legislation is mandated by the policies underlying dormant Commerce Clause doctrine.").

longer needed to prevent States from burdening commerce, and it matters not that the courts would invalidate the state tax or regulation under the Commerce Clause in the absence of Congressional action."[6]

¶ 71. In contrast, the United States Supreme Court has also explained that, when Congress has not " 'expressly stated its intent and policy' to sustain state legislation from attack under the Commerce Clause, [a court has] no authority to rewrite its legislation based on mere speculation as to what Congress 'probably had in mind.' "[7] State laws that "discriminatorily regulate or unduly burden interstate commerce are presumptively unconstitutional unless Congress enacts legislation to the contrary."[8]

¶ 72. To determine whether 49 U.S.C. § 40116 authorizes the hub exemption at issue in the instant case, I first set forth the state hub exemption and then determine whether § 40116 makes "unmistakably clear" that the Wisconsin hub exemption is spared analysis under the Commerce Clause.

¶ 73. Wisconsin Stat. § 70.11 provides for classes of property exempt from property taxation. One of the exemptions is for an "air carrier company" with a hub facility in the State.[9]

---

[6] *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 154 (1982).

[7] *New England Power Co. v. New Hampshire,* 455 U.S. 331, 343 (1982) (citations omitted) (quoting *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 427, 431 (1946) and *United States v. Pub. Util. Comm'n of Cal.,* 345 U.S. 295, 319 (1953) (Jackson, J., concurring)).

[8] Majority op., ¶ 31 (citing 1 Laurence H. Tribe, *American Constitutional Law* 1039 (3d ed. 2000)).

[9] An "air carrier company" is "any person engaged in the business of transportation in aircraft of persons or property for

¶ 74. Section 70.11 defines a "hub facility" as follows:

> a. A facility at an airport from which an air carrier company operated at least 45 common carrier departing flights each weekday in the prior year and from which it transported passengers to at least 15 nonstop destinations, as defined by rule by the department of revenue, or transported cargo to nonstop destinations, as defined by rule by the department of revenue.

> b. An airport or any combination of airports in this state from which an air carrier company cumulatively operated at least 20 common carrier departing flights each weekday in the prior year, if the air carrier company's headquarters, as defined by rule by the department of revenue, is in this state.[10]

¶ 75. The question, then, when considering 49 U.S.C. § 40116, is whether Congress with "unmistakable clarity" endorsed state taxation statutes that discriminate in taxing air carrier companies based on whether the air carrier company has a certain number of flights originating in the taxing state and whether the air carrier company has a headquarters in the taxing state. I conclude that Congress did not do so.

¶ 76. As the majority opinion points out, three subsections of 49 U.S.C. § 40116 are relevant in the instant case. First, § 40116(b) prohibits four types of taxation on air carrier companies:

> (b) Prohibitions. Except as provided in subsection (c) of this section and section 40117 of this title, a State, a political subdivision of a State, and any person that has

---

hire on regularly scheduled flights." Wis. Stat. § 70.11(42)(a)1. Aircraft is defined as "a completely equipped operating unit, including spare flight equipment, used as a means of conveyance in air commerce." Wis. Stat. § 76.02(1).

[10] Wis. Stat. § 70.11(42)(a)2.

purchased or leased an airport under section 47134 of this title, may not levy or collect a tax, fee, head charge, or other charge on—

 (1) an individual traveling in air commerce;

 (2) the transportation of an individual traveling in air commerce;

 (3) the sale of air transportation; or

 (4) the gross receipts from that air commerce or transportation.[11]

¶ 77. Section 40116(d) prohibits other practices that the Congress deemed unreasonable burdens and discrimination against interstate commerce:

(d) Unreasonable burdens and discrimination against interstate commerce.

(1) [definitions] . . . .

(2)(A) A State . . . may not do any of the following acts because those acts unreasonably burden and discriminate against interstate commerce:

 (i) assess air carrier transportation property at a value that has a higher ratio to the true market value of the property than the ratio that the assessed value of other commercial and industrial property of the same type in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

---

[11] 49 U.S.C. § 40116(c) permits a state to "collect a tax on or related to a flight of a commercial aircraft or an activity or service on the aircraft only if the aircraft takes off or lands in the State . . . ."

49 U.S.C. § 40117 deals with "passenger facility fees," and allows for certain types of fees.

(ii) levy or collect a tax on an assessment that may not be made under clause (i) of this subparagraph.

(iii) levy or collect an ad valorem property tax on air carrier transportation property at a tax rate greater than the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(iv) levy or collect a tax, fee, or charge, first taking effect after August 23, 1994, exclusively upon any business located at a commercial service airport or operating as a permittee of such an airport other than a tax, fee, or charge wholly utilized for airport or aeronautical purposes.[12]

¶ 78. Section 40116(e) permits certain types of taxes and charges except as provided in 49 U.S.C. § 40116(d):

(e) Other allowable taxes and charges. Except as provided in subsection (d) of this section, a State or political subdivision of a State may levy or collect—

(1) taxes (except those taxes enumerated in subsection (b) of this section), including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services; and

(2) reasonable rental charges, landing fees, and other service charges from aircraft operators for using

---

[12] 49 U.S.C. § 40116(d)(1) contains the following definitions relevant to the instant case:

(A) "air carrier transportation property" means property . . . that an air carrier providing air transportation owns or uses.

. . . .

(D) "commercial and industrial property" means property (except transportation property and land used primarily for agriculture or timber growing) devoted to a commercial or industrial use and subject to a property tax levy.

airport facilities of an airport owned or operated by that State or subdivision.

¶ 79. Nowhere in 49 U.S.C. § 40116 is it "expressly stated" that a discriminatory tax exemption for an air carrier company that has a hub in the taxing state is authorized. Nothing in 49 U.S.C. § 40116 expressly *permits* the hub exemption in Wis. Stat. § 70.11. Section 40116(e) permits taxation of an air carrier company's property, but it neither approves nor prohibits taxation of an air carrier company's property that discriminates against certain air carriers based on their connection to the taxing state. Thus, there is nothing in the text of the statute that supports the majority opinion's proposition that Congress has made it "unmistakably clear" that a state may provide tax exemptions based on the amount of business an air carrier company does within a state.

¶ 80. Nothing in 49 U.S.C. § 40116 *prohibits* the hub exemption in Wis. Stat. § 70.11. That is, none of the various prohibitions in § 40116(b) and (d) applies to § 70.11. Nothing in 49 U.S.C. § 40116 expressly prohibits a discriminatory tax exemption for an air carrier company that has a hub in the taxing state. That 49 U.S.C. § 40116(d) does not prohibit the hub exemption does not mean that Congress, in enacting § 40116, made it "unmistakably clear" that a tax scheme like Wisconsin's hub exemption is spared Commerce Clause scrutiny.

¶ 81. In sum, the federal statute permits certain taxes and prohibits certain taxes, but is silent about a tax exemption such as the one in Wis. Stat. § 70.11; § 70.11 fits neither the permitted nor prohibited classes. The majority errs when it declares that the

structure of 49 U.S.C. creates two types of taxes on air carrier companies and that taxes not prohibited under either subsection (b) or (d) are authorized by subsection (e).[13] Because the majority begins its analysis with this erroneous conclusion about subsection (e), its ultimate conclusion is, by definition, wrong.

¶ 82. The case law supports my reading of 49 U.S.C. § 40116 as not rising to the level of "unmistakably clear" authorization of discriminatory tax exemptions such as the hub exemption. In *Northwest Airlines, Inc. v. County of Kent, Michigan,* 510 U.S. 355, (1994), the United States Supreme Court recognized that the predecessor to § 40116(e) was a savings clause.[14] That is, § 40116(e) is intended to make clear that certain state taxes and fees that might otherwise have been prohibited by § 40116(b) and (d) are not prohibited.[15] Section 40116(e) was intended to preserve then-existing state tax powers rather than to confer new powers to tax on the states.

---

[13] Majority op., ¶ 37.

[14] For the purposes of the instant case, 49 U.S.C. § 1513, the predecessor to § 40116, was not materially different.

[15] *Nw. Airlines, Inc. v. County of Kent, Michigan,* 510 U.S. 355, 365–66 (1994) (citing *Wardair Canada Inc. v. Fla. Dep't of Revenue,* 477 U.S. 1, 15–16 (1986) (Burger, C.J., concurring in part and concurring in judgment)).

In *County of Kent,* 510 U.S. at 365–66, the Supreme Court explained the savings clause in the predecessor to § 40116 as follows:

> But § 1513(a) does not stand alone. That subsection's prohibition is immediately modified by § 1513(b)'s permission. Sections 1513(a) and (b) together instruct that airport user fees are permissible only if, and to the extent that, they fall within § 1513(b)'s saving clause, which removes from § 1513(a)'s ban "reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities."

245

¶ 83. The United States Court of Appeals for the First Circuit reached a similar conclusion, stating that 49 U.S.C. § 40116(e), "[f]ar from a clear manifestation of congressional intent to . . . [create new rights] . . . merely preserves certain rights of taxation already held by the states."[16] In short, nothing in § 40116 expressly authorizes a tax exemption such as the hub exemption.

¶ 84. The majority opinion cites two cases as supporting the proposition that 49 U.S.C. § 40116 authorizes the tax at issue in the instant case. However, both of those cases are inapposite to the issue currently before the court.

¶ 85. In *American Airlines v. County of San Mateo,* 912 P.2d 1198 (Cal. 1996), the California supreme court held that the predecessor to 49 U.S.C. § 40116(d) did not prohibit railroad and air carrier property from being taxed at different rates. Personal property of air carrier companies was assessed at 100% of full market value; railroad personal property was assessed at 70% of full market value. Even assuming that the California court is correct, this analysis does not answer the statutory "unmistakably clear" question presented in the instant case for two reasons.

¶ 86. First, the instant case deals not with discrimination between types of transportation property, but, rather, between an in-state and out-of-state air carrier company's property. Second, even if these two situations were analogous, concluding that 49 U.S.C. § 40116 *does not prohibit* certain types of discrimination is very different from concluding that the statute *authorizes* (with "unmistakable clarity") this type of discrimination. Nothing in § 40116 supports such an inference.

_____

[16] *United Parcel Serv., Inc. v. Flores-Galarza,* 318 F.3d 323, 337 (1st Cir. 2003).

¶ 87. The majority also relies on *Department of Revenue of Oregon v. ACF Industries,* 510 U.S. 332 (1994). In *ACF Industries,* the United States Supreme Court interpreted the Railroad Revitalization and Regulatory Reform Act (4–R Act).[17] The Supreme Court held that property tax exemptions for non-railroad property were not prohibited by the provision in the 4–R Act comparable to 49 U.S.C. § 40116(d).[18]

¶ 88. Like *American Airlines v. County of San Mateo,* the *ACF Industries* case is clearly distinguishable from the instant case because it deals with discrimination between types of commercial properties,

---

[17] As the majority observes, the 4–R Act is the model for 49 U.S.C. § 40116(d), and courts rely on cases interpreting the 4–R Act to interpret § 40116(d). Majority op., ¶ 45 n.17.

[18] *Dep't of Revenue of Or. v. ACF Indus.,* 510 U.S. 332, 335 (1994).

The majority opinion contends that the *ACF Industries* Court held that "principles of federalism" made it necessary to allow the tax exemptions because "the power to grant tax exemptions is among the traditional powers of the states and because states must be allowed to grant 'tax exemptions to encourage industrial development.'" Majority op., ¶ 46 (quoting *ACF Indus.,* 510 U.S. at 345).

What the Supreme Court actually said is that there is nothing in the legislative history to support the conclusion that "Congress had any particular concern with property tax exemptions, or that Congress intended to prohibit exemptions in" the relevant provision of the 4–R Act. *ACF Indus.,* 510 U.S. at 345. In other words, the 4–R Act (and thus 49 U.S.C. § 40116) was not intended to prohibit property tax exemptions. But, the issue in the present case is not whether § 40116 *prohibits* tax exemptions. Rather, the issue is whether Congress authorized, with unmistakable clarity, air carrier company tax exemptions that discriminate against interstate commerce, thus removing those exemptions from Commerce Clause scrutiny.

not with discrimination within a single type of commercial property based on how much business a particular company does in the state. *ACF Industries* is thus no help in the instant case to determine whether 49 U.S.C. § 40116 constitutes an "unmistakably clear" signal by Congress of approval for a discriminatory tax exemption in the present case for "home air carrier companies" but not other air carrier companies.

¶ 89. Quite simply, the language of 49 U.S.C. § 40116 and the case law interpreting § 40116 do not support the proposition that Congress has authorized with "unmistakable clarity" property tax exemptions that discriminate on the basis of the amount of business an air carrier company does within the taxing state. The majority opinion fails to build a persuasive case.

¶ 90. The inquiry about Congress's "unmistakably clear" statement, it seems to me, ought to end here. As the United States Supreme Court explained in *New England Power Co. v. New Hampshire,* 455 U.S. 331 (1982), Congress's intent to exempt certain types of state statutes from Commerce Clause analysis must be *expressly stated.*[19]

¶ 91. Courts, including the United States Supreme Court, have not, however, always taken the "expressly stated" language literally and in some cases have considered a statute's purpose and history in determining whether there is unmistakably clear Congressional authorization.[20] I therefore turn to the statutory and legislative history.

---

[19] *New England Power,* 455 U.S. at 343.

[20] *Maine v. Taylor,* 477 U.S. 131, 140 (1986) (considering history of federal statute to determine whether Congress foreclosed Commerce Clause review with unmistakable clarity regarding state wildlife legislation prohibiting importation of live baitfish); *United Egg Producers v. Dep't of Agric. of P.R.,* 77

¶ 92. I conclude that the statutory and legislative history and the purpose support the conclusion that 49 U.S.C. § 40116 does not authorize states to discriminate between air carrier companies based on whether they have a hub in the state. While the statutory and legislative history does not evince an intent to prohibit such statutes, it also does not authorize them with unmistakable clarity, which is required to foreclose Commerce Clause scrutiny.

¶ 93. The predecessor to 49 U.S.C. § 40116 was first adopted in 1973. The 1973 version of the statute included the predecessors to § 40116(b) and (e).[21] The predecessor to § 40116(d), the section prohibiting certain practices based on their effect on interstate commerce, was enacted in 1982.[22]

¶ 94. The 1973 statute was enacted in response to *Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.*, 405 U.S. 707, 716–17 (1972), in which the United States Supreme Court held that a tax or fee on air travelers was not a violation of the Commerce Clause as long as the charges were reasonable.[23] The Senate report on the bill indicated that Congress was concerned with the "chaos which local taxation brings on the national air transportation sys-

---

F.3d 567, 571 (1st Cir. 1996) (same; egg labeling requirements for eggs imported to Puerto Rico); *Goodman Oil Co. v. Idaho State Tax Comm'n*, 28 P.3d 996, 1000–01 (Idaho 2001) (same; Indian tribe exemption from state excise tax).

The majority ought to use federal methods of statutory interpretation of a federal statute. It ought not impose this state's rules of statutory interpretation on a federal statute. *See* majority op., ¶ 36.

[21] *See* P.L. 93–44 (1973).

[22] *See* P.L. 97–248, § 532 (1982).

[23] S. Rep. No. 93–12, at 17 (1973).

tem."[24] Thus, Congress sought to prohibit state and local governments from collecting head taxes on air carrier companies.

¶ 95. Nothing in the limited legislative history regarding the 1982 amendments indicates that Congress intended to authorize discrimination among air carrier companies based on the amount of business a company does within a state.

¶ 96. Courts look to the legislative history of the 4–R Act to construe 49 U.S.C. § 40116.[25] The 4–R Act was passed in 1975, but similar legislation had been under consideration since at least 1961. However, like the 1982 amendments to the predecessor to 49 U.S.C. § 40116, nothing in the voluminous reports on the subject in 1961, 1969, or 1975 indicates that Congress intended to authorize discrimination among railroad companies based on the amount of business a railroad company does within a state.[26]

¶ 97. The United States Supreme Court explained the thrust of the legislative history on the 4–R Act in *Western Air Lines, Inc. v. Board of Equalization of South Dakota,* 480 U.S. 123, 131 (1987). The purpose of the 4–R Act (and, therefore, 49 U.S.C. § 40116) was to insulate railroads from discrimination by states based on the fact that a railroad was an out-of-state business:

> The legislative history of the antidiscrimination provision in the 4–R Act demonstrates Congress' awareness that interstate carriers "are easy prey for State and local tax assessors" in that they are "nonvoting, often

[24] *Id.; see also* 119 Cong. Rec. H11, 13897 (daily ed. May 2, 1973) (statement of Rep. Clawson).

[25] *See* majority op., ¶ 45 n.17.

[26] *See* S. Rep. No. 87–445, at 445–90 (1961); S. Rep. No. 91–630, at 1–16 (1969); H.R. Rep. No. 94–725 (1975).

nonresident, targets for local taxation," who cannot easily remove themselves from the locality.[27]

It seems inconceivable that a statute intended to circumscribe interstate discrimination would also authorize (without so stating with "unmistakable clarity") tax exemptions that discriminate based on the amount of business an air carrier company does within the taxing state.

¶ 98. The majority opinion struggles mightily in 17 paragraphs, using intricate labyrinthine interpretive methods, to interpret 49 U.S.C. § 40116 as "unmistakably clear" in granting states authority to implement a tax discriminating among air carrier companies based on whether the air carrier company has a "hub" (as defined in Wis. Stat. § 70.11) in the state. The majority opinion essentially adopts the defendant's[28] argument that because Congress permitted property taxes and did not expressly prohibit property tax exemptions, exemptions such as the Wisconsin hub exemption are authorized. The majority's interpretive tangle does not rise to the level of "explicit" Congressional authorization or an "unmistakably clear" authorization of discriminatory tax exemptions such as the hub exemption.

¶ 99. Based on the text, the case law, and the statutory and legislative history, I conclude that, in adopting 49 U.S.C. § 40116, Congress did not, with

[27] *W. Air Lines, Inc. v. Bd. of Equalization of S.D.,* 480 U.S. 123, 131 (1987) (quoting S. Rep. No. 91–630, at 3 (1969)).

[28] The defendant in the instant case is the Department of Revenue. Midwest Airlines, Inc. intervened as a defendant to protect its interest in maintaining the hub exemption. Air Wisconsin, the other air carrier that benefits from the hub exemption, did not intervene. Except where necessary to distinguish between the parties, in this opinion "defendant" refers to both the Department of Revenue and Midwest Airlines.

unmistakable clarity, authorize the states to implement a tax and tax exemption that discriminate among air carrier companies based on the amount of business they do in a state. As a result, the hub exemption in Wis. Stat. § 70.11(42) must be scrutinized to determine whether it interferes with interstate commerce contrary to the implied limitations of the Commerce Clause.

## II

¶ 100. The negative Commerce Clause jurisprudence has been described as a "tangled underbrush" and a "quagmire."[29] Nevertheless, several basic principles for analyzing a statute under the negative Commerce Clause can be determined from the case law.

¶ 101. A state statute that directly discriminates against interstate commerce, or has the direct effect of favoring in-state business, is almost always invalidated without further inquiry. When the effect on interstate commerce is indirect, it must be determined (1) whether there is a legitimate state interest in the statute, and (2) whether the benefits to that interest outweigh the burden on interstate commerce.

¶ 102. In *Brown-Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 578–79 (1986), the United States Supreme Court outlined how it scrutinizes a statute under the implied limitations of the Commerce Clause as follows:

> This Court has adopted what amounts to a two-tiered approach to analyzing state economic regulation under the Commerce Clause. When a state statute directly regulates or discriminates against interstate com

---

[29] *Nw. States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 457, 458 (1959), *overruled by statute on other grounds as stated in Silent Hoist & Crane Co. v. Dir., Div. of Taxation,* 494 A.2d 775, 779 n.1 (N.J. 1985).

merce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. We have also recognized that there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church*[, 397 U.S. 137, 142 (1970)] balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity.[30]

¶ 103. A statute that clearly discriminates against interstate commerce, either on its face or in direct effect, violates the implied limitations of the Commerce Clause "unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism."[31] The Supreme Court has further observed that when a "state statute amounts to simple economic protectionism, a 'virtually per se rule of invalidity' has

---

[30] Citing *City of Philadelphia v. New Jersey,* 437 U.S. 617 (1978); *Shafer v. Farmers' Grain Co.,* 268 U.S. 189 (1925); *Edgar v. MITE Corp.,* 457 U.S. 624, 640–643 (1982) (plurality opinion); *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970); *Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 440–441 (1978).

The *Pike* balancing test, referred to in *Brown-Forman Distillers,* states that when a "statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike,* 397 U.S at 142.

[31] *Wyoming v. Oklahoma,* 502 U.S. 437, 454 (1992) (citing *Maine v. Taylor,* 477 U.S. 131 (1986)).

applied."[32] The *Pike* balancing test is not applied to a facially or directly discriminatory statute.[33]

¶ 104. In state taxation cases, the U.S. Supreme Court has generally applied an additional, more specific test. Under the test established in *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274 (1977), a state tax is permissible under the implied limitations of the Commerce Clause if (1) there is a substantial nexus between the taxed activity and the taxing State; (2) the tax is fairly apportioned; (3) the tax does not discriminate against interstate commerce; and (4) the tax is fairly related to the services provided by the State.[34] The third element—the tax does not discriminate against interstate commerce, the test in general negative Commerce Clause jurisprudence—is important in the instant case.[35] The Supreme Court has interpreted the *Complete Auto* test as stating that " 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."[36]

¶ 105. A review of the cases applying the *Complete Auto* test suggests that a facially or directly discriminatory state tax will be invalidated just as would any other facially or directly discriminatory legislation.

---

[32] *Wyoming,* 502 U.S. at 454 (quoting *City of Philadelphia,* 437 U.S. at 624.

[33] *See Pike,* 397 U.S. at 142.

[34] *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279 (1977); *Dep't of Revenue, State of Wash. v. Ass'n of Wash. Stevedoring Cos.,* 435 U.S. 734, 750 (1978).

[35] The other three elements of the *Complete Auto* test appear to be additional requirements for state taxes.

[36] *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.,* 511 U.S. 93, 99 (1994).

¶ 106. In *Boston Stock Exchange v. State Tax Commission,* 429 U.S. 318 (1977), six stock exchanges located outside of New York asserted a negative Commerce Clause challenge to a New York state statute that taxed securities transactions involving out-of-state sales more heavily than those involving in-state sales.[37]

¶ 107. The Supreme Court invalidated the application of a higher tax on out-of-state sales.[38] In invalidating the tax, the Supreme Court considered the history of the New York tax statute and determined that the statute was enacted for economic protection, that is, to help the New York Stock Exchange and encourage it to remain in New York.[39] The Supreme Court observed that the tax was invalid because the state was using its taxing power as a means of forcing more business into the state:

> [T]he State is using its power to tax an in-state operation as a means of requiring other business operations to be performed in the home State. As a consequence, the flow of securities sales is diverted from the most economically efficient channels and directed to New York. This diversion of interstate commerce and diminution of free competition in securities sales are wholly inconsistent with the free trade purpose of the Commerce Clause.[40]

---

[37] *Boston Stock Exch. v. State Tax Comm'n,* 429 U.S. 318, 319–20 (1977).

The taxes at issue in *Boston Stock Exchange* all involved a "taxable event" in New York. *Id.,* 321–23.

[38] *Boston Stock Exch.,* 429 U.S. at 328.

[39] *Id.* at 323–28.

[40] *Id.* at 336 (quoted source omitted).

The Court also observed in *Boston Stock Exchange,* 429 U.S. at 336–37, that a taxation system could still be used to encour-

¶ 108. Thus, because the tax was directly discriminatory against out-of-state business, it violated the implied limitations of the Commerce Clause.

¶ 109. This outcome is unsurprising. As early as 1958, the Supreme Court observed in *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 457 (1959), that a state may not "impose a tax which

age business growth and to compete with businesses from other states, as long as the taxation system does not discriminate:

> Our decision today does not prevent the States from structuring their tax systems to encourage the growth and development of intrastate commerce and industry. Nor do we hold that a State may not compete with other States for a share of interstate commerce; such competition lies at the heart of a free trade policy. We hold only that in the process of competition no State may discriminatorily tax the products manufactured or the business operations performed in any other State.

The tax exemption also may have a coercive effect to force air carriers to do more business in Wisconsin. *See Westinghouse Elec. Corp. v. Tully,* 466 U.S. 388, 406 (1984) (a New York tax credit that increased as the amount of exports from New York increased violated the commerce clause because it discriminated against export shipping from other states).

For a discussion of how the U.S. Supreme Court has gone about distinguishing between state tax regulations that impermissibly discriminate and those regulations that are held to be permissible "location incentive" tax regulations, see Walter Hellerstein & Dan T. Coenen, *Commerce Clause Restraints on State Business Development Incentives,* 81 Cornell L. Rev. 789 (1996).

Hellerstein and Coenen further conclude that the Supreme Court has given little guidance as to how a state tax scheme can encourage growth and development within the state without offending the Commerce Clause. *Id.* at 795–96. They explain the distinction between tax schemes that violate the Commerce Clause and those that do not and the distinction between permissible and impermissible property tax incentives. The instant case is clearly more like the impermissible examples offered by Hellerstein and Coenen.

discriminates against interstate commerce . . . by providing a direct commercial advantage to local business . . . ."[41] The taxes in most of the cases in which the Supreme Court has upheld a state tax against negative Commerce Clause challenges are not directly discriminatory.[42]

¶ 110. Applying the case law to the instant case, I conclude that the tax is facially discriminatory. Air carrier companies pay the ad valorem tax only if they do

[41] *Nw. States Portland Cement,* 358 U.S. at 458; *see also Am. Trucking Ass'ns, Inc. v. Schneiner,* 483 U.S. 266 (1987) (invalidating lump sum annual tax on operating trucks in Pennsylvania as directly discriminatory, and therefore invalid, because it imposed disproportionate share of costs on out-of-state businesses); *Maryland v. Louisiana,* 451 U.S. 725 (1981) (Louisiana's "first-use" tax, imposing tax on imported but not in-state natural gas, invalid discrimination against interstate commerce); *Burlington N., Inc. v. City of Superior,* 131 Wis. 2d 564, 575–76, 388 N.W.2d 916 (1986) (tax exemption invalid where "only real effect of the exemption . . . is to enhance or encourage the Wisconsin metalliferous mining industry at the expense of out-of-state miners").

[42] *See, e.g., Okla. Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175 (1995) (uniform state sales tax valid when applied to tickets for interstate bus travel); *Itel Containers Int'l Corp. v. Huddleston,* 507 U.S. 60 (1993) (sales tax on cargo containers in state valid when applied to shipper with only international business); *Quill Corp. v. North Dakota,* 504 U.S. 298 (1992) (uniform use tax valid when applied to mail order company with no physical presence in state); *Dep't of Revenue, State of Wash. v. Ass'n of Wash. Stevedoring Cos.,* 435 U.S. 734 (1978) (equally apportioned tax on value of goods loaded and unloaded in state valid when applied to out-of-state corporation). *But see Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274 (1977) (Mississippi tax on transportation of out-of-state goods into the state, the "privilege of doing business" tax, valid under principle that interstate commerce must "pay its own way").

not do enough business in Wisconsin. The hub exemption in Wis. Stat. § 70.11(42) applies only to businesses that the legislature is satisfied do "enough" business in the state.

¶ 111. The tax, therefore, is invalid as directly discriminatory against interstate commerce. The defendants have not shown that the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.[43] Indeed, as the majority opinion explains, the purpose of the exemption (and the discrimination) is to protect jobs, encourage the development of additional air transportation facilities in Wisconsin, and preserve the state's competitiveness in attracting and retaining business.[44]

¶ 112. Just like the taxes invalidated by the United States Supreme Court in *Boston Stock Exchange* and *Northwest States Portland Cement* and invalidated by this court in *Burlington Northern, Inc. v. City of Superior,* 131 Wis. 2d 564, 388 N.W.2d 916 (1986), the tax in the instant case discriminates against interstate commerce by providing a direct commercial advantage to companies that do enough business in the state. Only if an air carrier company does enough business in the state (as defined in § 72.11(42)) does it get the benefit of not paying the ad valorem tax. Thus, the tax and exemption together make up a tax that discriminates against interstate commerce by providing a tax advantage to in-state businesses.[45]

¶ 113. Because the tax and exemption at issue in the instant case directly discriminate against out-of-state air carrier companies based on the amount of

---

[43] *See Wyoming v. Oklahoma,* 502 U.S. 437, 454 (1992).

[44] Majority op., ¶¶ 1, 18–22.

[45] *See Nw. States Portland Cement,* 358 U.S. at 457.

business an air carrier does in the state, and because the tax system does not support a non-discriminatory state interest, I conclude that the tax and exemption, taken together, are unconstitutional as a violation of the implied limitations of the Commerce Clause.

## III

¶ 114.　Having concluded that the hub and head-quarters tax exemptions are unconstitutional, I must now consider the remedy.

¶ 115.　Northwest, which doesn't want to pay its taxes, would like this court to strike down the entire ad valorem tax.[46] It therefore contends that the exemption is not severable from the rest of the tax statute. It argues that striking down the exemption instead of the entire statute would create a tax contrary to the legislative intent,[47] which was, according to Northwest, to exempt air carrier companies from taxation.

¶ 116.　I do not agree. The proper remedy in the instant case is to invalidate the hub exemption in Wis. Stat. § 70.11(42). Under Wis. Stat. § 990.001(11), the general rule is that the invalidity of a statutory provision "shall not affect other provisions or applications which can be given effect without the invalid provision or application." The rule of severability applies unless

---

[46] The Department of Revenue, of course, opposes this result. Unsurprisingly, Midwest Airlines does not. Midwest has not been paying taxes because of the exemption. If the exemption were invalidated, Midwest (as well as Air Wisconsin, which did not intervene in the instant case) would have to start paying.

[47] *See Burlington N., Inc. v. Superior,* 131 Wis. 2d 564, 580–84, 388 N.W.2d 916 (1986).

259

severability "would produce a result inconsistent with the manifest intent of the legislature."[48]

¶ 117. Northwest's position is belied by the history of the ad valorem tax. The exemption was enacted in 2001.[49] The ad valorem tax, on the other hand, has existed since 1933.[50] The ad valorem tax statute itself was not changed in any relevant manner when the exemption was enacted. Clearly, the tax can exist independent of the exemption.

¶ 118. Striking down the exemption would not defeat the intent of the legislature. The statute was not intended to exempt air carrier companies from taxation. As I have already explained, the intent was to exempt air carrier companies who do a lot of business in the state from taxation, thus creating an incentive for air carrier companies to do more business in Wisconsin.

¶ 119. Striking down the tax altogether would not support the legislative purpose of charging a lower tax to air carrier companies who do more business in the state. The result is that striking down the entire statute would no more effectuate the intent of the legislature than striking down just the exemption.

¶ 120. I therefore agree with the circuit court that there is no reason to conclude that the legislature would not have enacted an ad valorem tax system for air carrier companies without an exemption for Wisconsin hub facilities. Northwest has not shown that the hub facility is so integral to the ad valorem tax system that it may not be severed. I conclude, as did the circuit court, that the proper remedy is to strike down just the exemption portion of the ad valorem tax.

---

[48] Wis. Stat. § 990.001(11).

[49] 2001 Wis. Act 16, § 2109; majority op., ¶ 3.

[50] *See* § 3, ch. 349, Laws of 1933.

¶ 121. For the reasons set forth, I dissent.

¶ 122. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.